*MARSHAL KEY *v.* C. VATTIER. [132

Contract with an attorney that he shall prosecute suits for the recovery of property, and that no compromise shall be made except he join in it, to receive part of the property recovered as compensation, illegal and void.

THIS was an action of covenant reserved and certified for decision from the Supreme Court in Hamilton county.

The case stated in the declaration is as follows: "By a certain indenture made between the plaintiff and one James W. Gazlay, of the one part, and Charles Vattier of the other part, the plaintiff and said Gazlay, on their part, did covenant and agree with the defendant, among other things, to use their best skill and abilities as the attorneys of the defendant, to recover and obtain from one James Findlay and one Nicholas Longworth the possession of certain property in said indenture mentioned, in the name and for the use of the defendant," etc., specifying a great variety of real

139

and personal property, "all of which, as is alleged in said inden-
ture, had been unjustly taken from the possession of the defendant
by said James Findlay and Nicholas Longworth, and other agents,
and who then held the same, etc. In consideration whereof, the
defendant did then and there, by said indenture, covenant to and
with said plaintiff and said Gazlay, that whenever the possession
of the aforesaid property should be recovered, or when any part
thereof should be recovered, he, the defendant, would forthwith
convey and deliver to the plaintiff and said Gazlay, in severalty,
the one equal moiety thereof, to each the one equal fourth part of
all or any part of the aforesaid property so to be recovered, and
that he would give to each severally good and sufficient title to the
same, such as he, the defendant, should have himself. And the de-
fendant, by said indenture, did further agree with the said plaint-
iff and Gazlay, that if any compromise should be effected, the
same should be the joint act and consultation of the parties to
said indenture."

The declaration proceeded to aver that the plaintiff and Gazlay
prosecuted a suit, which was referred, by consent of the plaintiff
Gazlay, and the defendant, to arbitration. That the arbitrators
awarded a large sum of money and certain specific property to
the defendant, who had obtained possession of it. That he had
been required to convey one-fourth part to the plaintiff, which he
refused, etc., assigning the breach in the usual form.

To this declaration the defendant demurred generally, and the
plaintiff joined in demurrer. The court of common pleas gave
133] *judgment for the defendant, and the plaintiff appealed to
the Supreme Court.

ESTE, in support of the demurrer:

This contract is against public policy, and upon that ground the
demurrer should be sustained. It is a rule, both of law and equity,
that *ex turpi contractu actio non oritur.* Whatever is contrary to
the policy of the common law, or against the provisions of a
statute, or repugnant to justice, or inconsistent with decency and
morality, is sufficient to vitiate a contract and render it void. 1
Com. on Con. 31–33; Jones *v.* Randall, Cow. 38–40. And the
same rule prevailed in the civil law. 1 Poth. on Obl. 126.

"All contracts and agreements for the maintenance of suits are
illegal and void at the common law." "Maintenance is defined

to be an officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party with money, or otherwise to prosecute or defend it." It is an offense against public justice, as it keeps alive strife and contention, and perverts the remedial process of the law into an engine of oppression. 1 Com. Con. 34.

In the contract under consideration, the defendant is not only assisted with the means of prosecuting the suit, but he is to be at *no expense, and has not the power of settlement. By the common law,* therefore, it will not, I presume, be denied but that the contract is *absolutely void.*

Is it so by the law of Ohio?

It is: 1. Because the common law, so far, at least, as it is based on morality and the principles of sound policy, is in force in this state.

2. Independent of the common law, as such, the contract is void.

In considering the case of Jones *v.* Randall, 1 Cowp. 38, Lord Mansfield says: "It is admitted by the counsel for the defendant that the contract is against no positive law; it is admitted, too, that no case is to be found which says it is illegal; but it is argued, and rightly, that notwithstanding it is not prohibited by any positive law, or adjudged illegal by any precedents, yet it may be decided so *upon principles,* and the law of England would be a strange science, indeed, if it were decided upon precedents only." And so, indeed, would be the law of Ohio.

Let this contract, then, be tested by the *principles of sound policy,* and if conformable to them, enforce it; if not, declare it void.

The *peace of society* requires that strife and contention should be *discouraged; it should, therefore, be the policy of every [134 well-regulated community to prevent all contracts which have a tendency to keep them alive. A contract would not be tolerated that impeded the due course of justice. And why? Because the good of society requires that no member of it should possess the power of enforcing an agreement calculated to obstruct the administration of justice. It is equally for the good of society that courts of justice should refuse aid or sanction to agreements directly tending to disturb its repose. In the contract before the court strong temptations are presented to engage in litigious controversies. The claims are numerous, large in amount, and the

compensation the moiety of all that is recovered. A strong inducement is presented to the defendant to permit the adventurers to push their speculation, and to "pervert the remedial process of the law into an engine of oppression," by their stipulation to indemnify him from all expense. It may be said that a man may be poor, timid, or doubtful of success, and that unless permitted to make an agreement upon some such terms his rights might be lost. Without stopping to inquire into the justness of the argument as applicable to an individual case, let it be admitted that occasional instances may occur of the description mentioned; it is therefore legitimate to argue that every facility shall be afforded to adventurers and speculators, that ingenuity, whetted by avarice, can contrive, to stir up litigation, to vex, harass, and oppress, and to break in upon the peace of every neighborhood? Every general rule of law may be prostrated by such a course of argument.

But there is another and most objectionable feature in this contract. As if apprehensive that Vattier might grow weary, or from some other motive feel inclined to put an end to this formidable system of warfare, it was deemed prudent to tie his hands, and stop his mouth, and say that peace should not be made but by the *joint act of the parties*, the adventurers composing the majority.

Thus by this contract strife is not only stirred up and kept alive; the process of the law perverted as an engine of oppression; the plaintiff and his coadjutor to have half of all they can recover; the defendant to be indemnified against all costs and expenses; but he is absolutely prevented from discontinuing his suits, settling or compromising his claims. It is believed, therefore, that the contract declared on can not be sustained; that by the principles of public policy it is void, and that the defendant is entitled to judgment on his demurrer.

**135]** *Guilford and Hammond, contra:

This case presents one single question for decision. Is an agreement illegal and void, by which a lawyer agrees to prosecute a suit for the recovery of property, to be compensated out of a part of the property recovered?

Such a contract would be void in England, and in some of our sister states, because the making a contract of this nature is prohibited by statute, and declared an offense subject to be punished criminally. This kind of offense is denominated champerty and

maintenance, and as such is described in the books. In Ohio, the legislature have not deemed it sound policy to create or define any such offense, or to attach to the fact itself any punishment or other mark of reprobation.

It is the province of the legislature to prescribe the rule of individual conduct, not that of the court. Sound discretion and considerations of policy belong to the exercise of legislation—interpretation and application to the court. Nothing can be more distinct than legislative and judicial functions, and whenever a court take upon themselves to supply legislative omissions, they depart from their proper sphere of duty.

The right of making contracts is a high personal privilege of the citizen. The legislature may restrain this right where, in their views, the public safety or the public good requires it; but no other power in the state can restrain it. It is especially the province of the courts of justice to enlarge and protect this, as well as every other personal right. Should the court enter into discussions of public policy, and on that ground restrain the privileges of contracting, where the legislature have not restrained it, and where public morality is not involved, it would be setting a dangerous precedent, and introducing a present mischief—that of assuming legislative powers.

If, however, this inquiry and examination is to be gone into, how does the matter stand upon principle? It can not stand upon authority, for the foundation upon which all the authorities rest, the law declaring it an offense, does not exist in Ohio. Where there is not the same cause, there can not be the same consequence.

The English books, ancient and modern, abound in denunciations against champerty. Coke calls it the most odious species of maintenance. Blackstone informs us that the practice is greatly abhorred by the law of England, and describes those who engage in it as the pests of civil society, referring at the same time to the severities inflicted upon champertors by the Roman law, in support of *his own assertions. And in treatises upon con- [136 tracts, champerty, as matter of course, is stated as one cause for holding a contract void.

If we could consider the subject abstracted from the impressions we receive from these denunciations, we would feel none of the abhorrence here spoken of. An individual placed in the power

of unfeeling and rapacious men, is illegally and oppressively stripped. of his property, and turned, with his family, destitute, desolate, and helpless upon the world. A lawyer proposes to investigate his case, to prosecute his claims, and restore him to his rights, at his own risk and charges, and to receive compensation, if any, out of the amount recovered. Is there anything abhorrent to humanity or repugnant to justice in this? It can not be pretended. The effect is to be produced by reversing the picture, and affixing to the transaction the character deduced from its darkest shades, when abused and applied to the purposes of mischief. An innocent and unoffending man may be vexed and harassed by unfounded and malicious suits, until, in mere weariness and exhaustion, he shall buy his peace. This may be done. And every personal right may be and is abused. That furnishes no reason why its nature and character shall be estimated only by its darkest side—its fair, beneficent, and useful traits of character excluded from sight, and its exercise restrained in regard to the fact that it may be mischievously employed.

If we trace the established doctrines, in England, upon this subject to their source, we shall find nothing in their origin or object to recommend them to our adoption

Rome is, to be sure, called a republic, but we know that it was a tremendous and despotic military aristocracy—and that the ruling men in the state disposed of property in the most arbitrary and tyrannical manner. Estates frequently rested not upon legal right, but upon present power. It was, therefore, of the utmost importance that the right of the present possessor should remain unquestioned. Nothing could be more consistent than the enactment of highly penal laws against such as should presume to pry too closely into the foundations of property, or attempt to set up right in opposition to actual possession.

At the early common law, it was held to be an offense against public justice for any man to aid or assist another in matters pending before a court of law. We trace this principle to about the close of the eleventh century, when the Norman conqueror, having subjugated the country, and despoiled the natives of their property, divided all the lands in the kingdom into sixty thousand 137] knight's *fees, and distributed them among his followers. The principle was well adapted to the occasion. Indeed, it was

a most appropriate maxim during the whole period that the violence and injustice of the feudal system prevailed.

Two hundred years after the conquest, the incongruous and heterogeneous parliament of Edward I. enacted the first statute against maintenance and defining champerty. The unsettled state of property resulting from the assumption of estates by the crown, for forfeitures and escheats, and the regranting those estates to the followers and favorites of the monarch, rendered such a law indispensable to the safety of the parties in possession.

It was in 1538, that Henry VIII. completed the suppression of the monasteries in England, and proceeded to escheat their estates and grant them to his courtiers and parasites. In 1540, he suppressed the order of the Knights of Malta, and seized and disposed of their estates and revenues. Here was another urgent occasion for strengthening the arms of violence and wrong in possession, against right and justice dispossessed. And accordingly, in this very year (32 Hen. 8, chap. 9), we find parliament enacting and confirming the statutes against maintenance and champerty, and declaring it unlawful to purchase any estate, unless the vendor or the person under whom he claimed had been in possession within one year preceding the purchase. The object and the policy of this statute, at the time it was enacted, is manifest. But there can be no such object, no such policy in Ohio.

Under these statutes and the common law, of which they are held to be affirmative, jurists imbibed their ideas of champerty: The courts of justice decided that it was unlawful for a master to pay counsel out of his own money, or to speak at the bar for his servant. 5 Com. Dig. 16. It was even decided unlawful for a friend, without compensation, to prosecute the business of a widow, in settling her deceased husband's affairs. Dyer, 355, B. And these decisions make no distinction whether aid is afforded in support of right and justice or in the furtherance of unfounded and vexatious litigation. As the subject matter of the contract was declared to be unlawful, it was inevitable that the contract itself should be deemed invalid. But neither the common law, nor the statutes upon this subject, have ever been in force in Ohio. If this contract be void, it must be for a reason different from that upon which similar contracts have been held void elsewhere.

This contract is said to be against sound policy. What is meant

Key *v.* Vattier.

*by sound policy, as the terms are employed in this argument? The decencies, proprieties, and charities of life, that constitute public morals, exist in society, independent of considerations of policy, and without the aid of positive institutions. A contract to do an act against which the moral sense of society revolts, as degrading and disgraceful, can not be enforced in a court of justice although no positive law forbid the action. Contracts for prostitution or for the establishment of brothels are of this character, and, in the progress of society, others of similar tendency may be made. But contracts, in respect to subjects that do not and can not affect the public morals, in this sense, can not stand upon the same ground.

Sound policy, in a political view only, can mean nothing but prudential maxims of government. When the legislator is about to act, it is his duty to examine what is proper, prudent, expedient. When the law is enacted, it prescribes the *public policy*. In applying the law, the judge can set up no other *policy* than that which the legislature have declared in the statute he has before him. Where there is no common law, the maxims of which may be considered as declarative of public policy, in the light it is to be here regarded, the enactments of the legislature alone can decide what individual act or contract it is sound policy to prohibit. If an act have no indecent or immoral tendency, and be not prohibited by the legislature, it is not for the courts to say that a contract to perform that act is void, because against sound policy. It is necessary, at the outset, to establish a rule by which we may decide what is or is not sound policy, before we can declare a contract void as against it. We say that an act can not be against sound policy, which no statute prohibits, and by which no individual sustains an injury. We do not see how a different proposition can be maintained.

The legislation of the state is not silent on this matter. It has been considered and acted upon, and consequently the public policy with respect to it made known. The twelfth section of the act for the punishment of certain offenses, is in these words: "If any judge, justice of the peace, clerk of any court, sheriff, constable, attorney, or counselor at law, shall encourage, excite, and stir up any suit, quarrel, or controversy between two or more citizens of this state, whereby any citizen shall be defrauded and injured in said suit, quarrel, or controversy," such person shall be fined or

146

imprisoned. The policy of this provision is every way more equitable and just, and better adapted to our principles of government and state of society than the doctrines of champerty and maintenance deduced from the common and statute law of Edward I. and Henry VIII.

*In the first place, the act subjected to punishment is that of [139 encouraging, exciting, and stirring up suits, quarrels, and controversies, " whereby any citizen shall be defrauded and injured." This excludes the absurdity of making it criminal for one citizen to aid another in obtaining right and justice. It only reprehends the infliction of injury—but he whom the law adjudges a wrong-doer can not by the same law be deemed an injured person. If a contract be made, whereby one agrees to encourage, support, maintain a suit or controversy by which injury is done to others, such contract could not be enforced. It would be pronounced invalid as against the policy of this statute. But a contract like this, entered into to aid and support a controversy, in which right and justice has been done, can not be against public policy in Ohio, because it contravenes no law and inflicts no injury.

In the next place, this section does not imitate the legislation of dark and arbitrary ages, in an attempt to sever the social relations. It does not forbid those whom bonds of affinity and ties of duty unite in feeling and in interest, from aiding and encouraging each other in their respective controversies and lawsuits. It leaves them to obey the dictates of nature, and the feelings of humanity; and inflicts punishment only upon those who do injury in violation of the duties of public trusts, which they have taken upon themselves to discharge. This is a declaration of the public policy of Ohio upon this subject by the only competent authority. The courts of justice ought not, can not declare another and a different policy.

Our situation and modes of doing business are totally different from those of the countries in which the notions about champerty and maintenance had their origin. *Nemo alieno nomine lege agere potest,* " was a maxim of the Roman law, and at the ancient common law an attorney could not appear in a suit without a special license under the king's letters patent." This was consistent with the doctrines they held as to maintenance and champerty. But we make it a part of our system that the rights of parties shall be prosecuted and defended in our courts by men purposely educated

and instructed for that employmert. They come into our courts as matter of right, in the name of others, to defend or prosecute suits. It is a separate, distinct business, a profession. We consider it as reputable, and at the same time recognize that it is stipendiary in its character—nay, we do not hesitate to enforce contracts for a compensation. Upon what consistent principle can we adopt the maxims of other countries, and other times; or how shall 140] *we limit the subject of contracts for compensation, otherwise than to transactions prohibited by law, or immoral in their nature? ·

An individual conceives that he has a claim of right to property. He states his case, and asks the opinion of counsel. It is given in favor of the claim. He then asks, upon what terms will you· prosecute this business? The notion seems to be, that it is lawful to make one kind of bargain, but unlawful to make another. The counsel may stipulate to commence a suit, to prepare the pleadings, to take the depositions, to have the witnesses summoned, and to advance all the money necessary to effect these purposes. The party may stipulate to pay a sum certain to the counsel by way of compensation. The contract thus made would be obligatory. But should the party say I am poor, I have not the means of prosecuting this claim—if I do not succeed in the suit I can not even pay the costs—then no contract can be legally made—nothing can be done, unless the lawyer will prosecute the suit gratuitously, and at his own risk.

The rule, maxim, principle, no matter what it is called, that makes void a special contract, in which a lawyer prosecutes a suit at his own costs, to receive compensation out of the subject recovered, must have the same effect upon an implied contract, when. the lawyer is distinctly informed that he can receive neither compensation for labor employed, nor money expended, except out of the subject in controversy. If he prosecute the suit, and succeed, he can only claim remuneration upon a contract implied—and this contract is invalid, because it is infected with the fact that he expected to receive nothing unless there was a recovery, and out of the subject recovered. Nothing but the clearest provision of positive law, or the binding force of long-established precedent can warrant such a decision.

If a man may lawfully stipulate to labor for compensation, he· may stipulate to receive the compensation upon any condition not

Key *v.* Vattier.

unlawful, or immoral, and out of any fund or article legally the subject of contract.

Where the safety, security, or possession of property is in jeopardy, and is secured by the exertions of others, the owner is better able, and is always more willing to make liberal compensation for the actual labor, than if the property were lost. Where labor, or enterprise, in the service of others, is successful, the party that performs it expects a higher reward than if it had been unavailing. This feeling enters into all the concerns of men, and operates upon *all their actions. Full scope is given to it in agricultural, [141 commercial, and mechanical pursuits; and no sound reason is perceived for withholding its stimulus from those employed in the management of legal controversies.

Our laws manifest no abhorrence of the transfer of choses in action, or of rights not in possession. They provide for the first in many instances, and they leave the latter to be bought and sold upon the same footing with rights in possession. The validity of a conveyance or contract for the sale of lands, does not depend upon the fact whether the vendor be in possession, whether he ever was in possession, or how long his possession may have been divested.

As there is no law forbidding the sale of rights not in possession of the vendor, so neither is there any law regulating the terms and conditions upon which such sale may be made. If there is nothing illegal or immoral in an absolute sale, there can be nothing illegal or immoral in a conditional one. It must be every way as competent to make payment in the performance of service, and in the discharge of expenses incurred in prosecuting a suit to recover the subject, as to make payment in any other property or service. It is as lawful to purchase part as to purchase the whole.

In the case in hand, it is agreed that the plaintiff might lawfully engage to aid the defendant in the prosecution of suits against Findlay and Longworth for a reward—that there is nothing illegal, immoral, or against public policy in making such a contract. It is agreed that the plaintiff might legally have purchased the whole right claimed by the defendant, and have prosecuted suits in his own name to recover it. In other words, the plaintiff might lawfully sell his professional services to the defendant, and might also legally purchase the whole subject of claim. But the services

149

can not be given direct in part payment for the claim—nor can a. part of the claim be given as compensation for the services. Either is a lawful subject of contract between the parties; but they can not be bartered against each other. Surely no force of preconceived opinion can secure to so palpable an absurdity the color of reason or justice.

From the commencement of our jurisprudence, the legal profession have been in the habit of stipulating for conditional and contingent fees very frequently, where the plaintiff is a party, to be paid out of the sum recovered, and in proportion to the amount. A contract to this effect is, in principle, not distinguishable from that under consideration. If the counsel agree to adventure anything *upon the result of the suit, the consequence must be the same whether he adventure much or little. If he may lawfully labor in the collection of money for a per cent. upon the amount recovered, he may lawfully prosecute a claim for land, to receive a part of it. If he may lawfully adventure his labor for a compensation out of the subject, he may lawfully adventure his money. If he may agree to pay a part of the expenses, he may agree to pay the whole. If he may legally acquire any interest in the result of the suit, there exists no rule to limit the extent of that. interest.

When the principle is properly investigated, it will appear that every lawyer of the state, who has been engaged in tolerable business, must have made contracts in principle liable to the same objection as this. It has been a very common mode of contracting, both in Ohio and in a neighboring state. The most distinguished members of the profession, men of the most unsullied character, and who have filled the highest offices in the state, have made these contracts without reproach from themselves, or from others. Is not this strong evidence that they have not been considered *mala in se,* that they contain nothing iniquitous, nothing *contra bonus mores,* nothing of moral turpitude? But that, on the contrary, they have been deemed fair and mutual, as beneficial to the parties concerned as any other contract. As no law forbids the making of this contract, as it is founded upon nothing immoral, as it has produced no injury, we can not suppose that it will be pronounced void, because similar contracts, in other countries, where different. laws are in force, have been so considered.

Opinion of the court by Judge BURNET :

This action is brought on articles of agreement, executed in October, 1816, between the defendant, Charles Vattier, of the first part, and James W. Gazlay and Marshal Key, attorneys at law, of the second part. The contract, after reciting that the said Vattier had been formerly in possession of, and then claimed title to sundry tracts of land, and also to sundry notes, bonds, bills, goods, chattels, and moneys, to a large amount, which had been unjustly taken from his possession, provides that the said Vattier, with a view to have the said property recovered, and in consideration of the covenants on the part of the said Gazlay and Key, constitutes them his attorneys, with power, in his name, to sue for the property, etc., and to take all legal means to recover the same; and that when the same, or any part thereof, be recovered, the said Vattier shall convey to them an equal moiety, *and deliver    [143 to them, in severalty, each, one-quarter or fourth part, with such title as he may have. The plaintiff and Gazlay covenant to use their best skill to recover possession of the property, and to save and keep Vattier harmless of and from all costs and charges, in consequence of their prosecution of the same, and if any compromise should be effected, Vattier stipulated that it should be the joint act and consultation of the parties; and the parties bound themselves in the penal sum of one hundred thousand dollars. The defendant demurred generally to the declaration.

The court are now to decide, whether this contract amounts to champerty and maintenance, and if it does, whether an action can be sustained on it in the courts of this state.

The first question seems to admit of no doubt. The object of the contract was, by action or actions in the name of Vattier, to recover property in the possession of third persons, who held it by claim of title. The plaintiff and Gazlay covenant, as attorneys at law, to institute and carry on the suits. They are bound to defray the cost, and as a consideration for their services, they are to receive an equal moiety of whatever may be recovered; and Vattier engages not to settle or compromise the claims without their consent.

Champerty is a bargain with plaintiff or defendant to have part of the land or other thing sued for, if the party that undertakes it prevail therein, whereupon the champerty is to carry on the party's suit, at his own expense. 1 Inst. 368; 4 Blac. Com. 135; 5

Com., title Maintenance A; Jac. L. D., title Champerty. Every champerty implies maintenance. 2 Inst. 208. Maintenance is an offense that bears a near relation to barratry, being an officious intermeddling in a suit that no way belongs to one, by maintaining or assisting either party with money or otherwise, to prosecute or defend it. It is an offense against public justice, as it keeps alive strife and contention, and perverts the remedial process of the law into an engine of oppression. 4 Blac. Com. 134; Hawk. P. C. 249; Do. St. 203. The punishment by common law is fine and imprisonment. 1 Hawk. P. C. 255.

The contract in this case shows that the plaintiff was to intermeddle in the suits of Vattier, by assisting him with his services, and by the payment of cost, which comes most unquestionably within the definition of maintenance. In addition to this, the plaintiff and his partner, in consideration of that intermeddling, are to receive a moiety of the land, or whatever else may be recovered. These facts most unequivocally constitute the offense of champerty.

144] *The next inquiry is, can this action be sustained? In this state we have no general statute prohibiting or punishing champerty, and the common law, in relation to the punishment of crimes and misdemeanors is not in force. But although this be the case, it by no means follows that they may be lawfully and innocently practiced, or that the aid of the state tribunals may be had, to sanction and enforce them. The contract between these parties is against public justice, and such engagements have always been considered as injurious to the peace and happiness of the community. The nature and moral tendency of actions can not be effected by the manner in which the law treats them. If they be in their nature injurious, they must be considered offenses, whether the state has thought it necessary to punish them or not. Human legislatures act in subordination to the great Lawgiver. They can not change the nature of actions, or make them intrinsically right or wrong. There are many misdemeanors in this state for which no punishment has been provided, probably because the legislature have supposed that the influence of public opinion would be sufficient to suppress them. In such cases as the one now before us, they might naturally believe that public opinion, aided by the want of a legal remedy to enforce contracts, would afford all the remedy required. However this may be, it is believed that by omitting to provide a punishment in all cases of champerty and maintenance,

they neither intended to afford them their sanction, nor to open their courts for their protection and encouragement. Every author that treats on the subject tells us they are against the common law. Wood's Inst. 413; 2 Inst. 208; 4 Blac. 135; Com. Cont. 173.

By the common law, persons guilty of maintenance may be indicted, fined, and imprisoned, or compelled to make restitution by action; and a court of record may commit a man for an act of maintenance done in the face of the court. 1 Inst. 368; Jac. L. D., title Maintenance. That a court of common law should be required to enforce a contract against the common law, and for which it provides a punishment, would be mysterious; and it would be still more so, that while they are enforcing such a contract, by sustaining an action on it, they should also sustain an action against the plaintiff in that cause, and compel him to make restitution to the party injured by that contract, and that, too, on the ground of its illegality. The inconsistency of such a course is still more strikingly illustrated by the concluding part of the authorities last cited, by which it appears that a plaintiff, in a suit like the present one, may *be committed by the court for a contempt, by attempting, in [145 their presence, to perform the services that constitute the consideration of the contract on which he sues. Or, in other words, that a transaction, so palpably illegal as to be punishable, if attempted in a court of justice, may, when performed, become a sufficient consideration to support an action. To render a contract legal, the subject matter of it must be not only physically, but morally possible. An agreement can not possess an intrinsical, obligatory form, or sustain an action, in a court of justice, unless the subject matter of it be a thing about which the parties have a legal right to stipulate at their pleasure. An agreement, therefore, to do a thing in itself unlawful, must be void; for it would be absurd, that an obligation which derives its sanction from the law, should create a necessity of doing an act which the law prohibits. Let these principles be applied to the case before us. The plaintiff covenants to maintain the defendant in sundry suits at law, in consideration of which the defendant agrees to give him the moiety of whatever may be recovered. This covenant, on the part of the plaintiff, is a condition precedent, and must be performed to entitle him to his action. In other words, the law requires him to prove that he has done an illegal act, as a legal consideration to sustain his action; for if the

action be sustained, the plaintiff must aver and prove that he has maintained the defendant, which is an offense at common law.

Two reasons are assigned, by Powell on Contracts, why an act undertaken against law is void. First, because when the object of a contract is against a man's duty, it may be presumed that he did not give it his free assent. Second, because the law, by forbidding the act, takes from the contractor the power of obliging himself to do it; and from the opposite party the power of requiring it to be done. In the case before us, the consideration must be done in order to sustain the suit. If the suit can be sustained, the defendant must have the power of requiring the performance of the consideration, which is illegal.

There are a variety of cases which show by analogy, that this action can not be sustained. Marriage brokage bonds are void, because they are against the public welfare. Contracts are void if their consideration be illegal or unconscientious. Esp. Dig. 88, 94; Cowp. 793. A bond given to a sheriff to continue a true prisoner is void at common law, because it may be used for the purposes of oppression or extortion. A bond to an alien enemy is said to be void, because it is against public policy. All contracts against any rule, *or maxim of law, are said to be void, and the very case now under consideration, to wit: an agreement for unlawful maintenance, is given as an example of a contract which is void, because it militates against the public welfare. Pow. 173. Contracts like the one before us are said to be the most odious species of maintenance; should they be sustained, they will probably become frequent. The prospect of obtaining a large amount of property as a consideration for professional services, and the risk of an inconsiderable bill of cost, form a strong temptation to speculate in lawsuits. It may induce men to purchase the right of instituting suits on trifling pretenses, for the purpose of forcing defendants to injurious and ruinous compromises as the most effectual means of purchasing peace. Suits may be brought in succession against an individual, until his patience is exhausted, and he is reduced to the terms of his oppressor. The ignorant and the weak will be constantly liable to be practiced on; unreasonable portions of their just demands may be obtained on the representation of difficulties and risks that have no real existence. The injunction of sacred writ which gave rise to the imparlance, and which invites us to agree with our adversary, will be impeded in

its operation. The parties originally interested, and who but from the merits of their claims will be prohibited from settling them, are forced to continue their legal warfare till the expectations of some greedy champertor are fully satisfied.

Such practices are oppressive on the parties immediately concerned. They have an injurious effect on the community at large; they are against the policy of the law, and ought to be suppressed.

The counsel who argued this cause have manifested their usual ingenuity, and it is due to them, as well as to the case itself, that we deliberately examine the grounds they have taken. It is assumed by them as an admitted point, that champerty and maintenance are not offenses in Ohio. If by this we are to understand merely that they are not generally punished by indictment, the position will be granted; but it can not be admitted that they are not offenses in the eye of the law. The authorities before cited show that they are. Offenses do not become innocent when the law forbears to punish them; the moral character of actions remains the same, whatever may be the punishment provided for them.

It is admitted that the legislative and judicial departments are distinct. It is the province of the one to prescribe, and of the other to enforce the law, and neither has the right to exercise the powers *of the other. We also admit that the right of mak- [147 ing contracts at pleasure is a personal privilege of great value, and ought not to be slightly restrained; but it must be restrained when contracts are attempted against the public law, general policy, or public justice. It is also alleged that such contracts were never considered as *mala in se.* This will depend on determining whether they be perfectly indifferent in themselves, or whether they involve any degree of public mischief or private injury. If the latter, they must belong to the class of actions denominated *mala in se,* as this appears to be the distinction recognized by the best writers on criminal law. These writers tell us that maintenance is an *offense against public justice;* that it perverts the remedial process of the law into an engine of oppression; that it keeps up strife and contention. The Roman law denominated it the *crimen falsi,* and the common law punishes it by fine and imprisonment. It can not, therefore, be indifferent in itself,

.and it must be attended with public mischief as well as private injury.

That such contracts have been frequent proves nothing of use to the plaintiff. We can not resort to the maxim *communis error facit jus;* it has no application to a case like this. But we appre-·hend that such contracts have been less frequent than the gentlemen imagine. By this contract counsel stipulate, as a compensation for their services, that they shall receive a moiety of all they may recover. They are to indemnify the plaintiff against costs, ·and he is bound not to settle or compromise without their consent. If such contracts have been common, we have yet to learn the fact. It is to be hoped, however, the counsel have been misinformed; but if not, it is certainly time the law should give a check to such a practice.

We have been carried back to the origin of laws against maintenance and champerty. They have been traced to the violence of the feudal system and the despotism of rapacious conquerors. This may, in part, be true. Some of the finest principles and rules of the common law took their rise under the same system, and grew out of a state of things that has ceased to exist, and some of them from circumstances that have long been forgotten; but this is no argument against their policy or their obligatory effect. It was admitted in argument, that if such a contract be attended with injury to an individual it is void, but not otherwise. Without stopping to point out the actual existence of such injury, we remark that the law does not usually wait to ascertain the consequences of actions in every particular case, in order to de-148] termine their character. Experience *enables us to judge of the natural ·tendency of any particular class of actions, and when that teaches that they are generally unnecessary, mischiev-·ous, and impolitic, the law will fix their character and determine them to be against public policy, without waiting to measure the quantum of injury resulting from each particular case. This pre-·caution, however, has been required by the legislature in a case like the present, when it is to be punished by indictment. The fact of the injury renders the act indictable—in the absence of the injury, the matter is left as it was at common law.

The existence of a distinct class of men, whose profession it is to prosecute and defend the controversies of others, is also urged .as a reason against the doctrine on which the defense in this case

is predicated; but we do not discover the force of the inference attempted to be drawn from this fact. It is admitted on all hands that in England, in New York, in Virginia, and in other states, the contract before us would not only be void, but would be punishable by indictment—yet we find the same class of professional men existing in those states, constantly employed in prosecuting and defending for their clients. The nature of their employment and the character of their engagements are not found to be incompatible with the doctrine in question, nor can we see why such incompatibility should be found in the State of Ohio. The rule contended for may prevent professional men from oppressing the unfortunate, and extorting unconscionable fees from the weak and the timid. It may prevent them from stirring up suits, and prosecuting claims which have neither law nor equity to support them, depending for success on the loss of testimony, the treachery of memory, or what has been denominated the glorious uncertainty of the law. It may prevent them from carrying on one suit after another against the same person, for the purpose of hunting him down and driving him to sue for peace on any terms; but it can not interfere with the fair and legitimate practice of the profession, as the experience of Great Britain, New York, and other states testifies.

It is not uncommon for counsel, in the zeal of argument, to resort to extreme cases as a test of principle. This has been done in the case before us. The imagination has been put on the stretch to get up a case in which the rule might prevent the prosecution of a meritorious claim. But if such a case exist the plaintiff can take nothing from the fact, nor can we admit the propriety or safety of such a course of reasoning. A case may be supposed in which *great good would result to the community, from permitting [149 a private citizen to take the life of a culprit running at large, but such a case furnishes no argument against the policy of punishing murder. A man may be reduced to the alternative of starving or stealing, yet the gentleman would not urge this as a reason for repealing the statute against larceny. A debt justly and honestly due may be lost by the statute of limitation, yet a knowledge of the fact has not led to a change of the policy on which those statutes are founded. It may, therefore, safely be admitted that the rule in question may operate injuriously on some particular individual, as such an admission will neither contradict the existence

157

of the rule, nor shake the policy on which it is founded. Experience teaches us, however, that such cases are extremely rare, if they ever exist. An oppressed citizen, with merits on his side, will seldom want an advocate. A large proportion of the members of the bar have humanity enough to redeem the profession from the imputation which such a case would cast on the whole corps; and we know of none whose benevolence would with greater certainty lead them to espouse such a cause, than the gentlemen who urge the possibility of its existence.

The argument drawn from the practice in common life, of stipulating a reward for labor, or enterprise, in proportion to its success, if carried to its full extent will destroy its own effect. It necessarily leads to the removal of every obstruction to the practice of the law, as a profession, and condemns the statute regulating the admission and practice of attorneys. The same policy which permits men in their ordinary business, to stipulate for contingent rewards, throws open every branch of useful industry; but this is not the case in affairs of legal controversy. The practice of the law can not be pursued as a business, at the pleasure of any individual. The right must be acquired in a particular way, and when acquired, must be pursued according to certain rules, or it will be forfeited. Why, it may be asked, do these impediments exist when they are not to be found in the ordinary pursuits of life? The answer is at hand: public policy requires them—the peace and quiet of the community require them—legislatures and the safety of parties litigant require them. We find, then, a rule existing in the administration of justice, and in matters of legal controversy, the propriety of which every man acknowledges, but which has no existence and would be unjust in the ordinary pursuits of men. If this distinction be correct, as it certainly is, what keeps us back from the conclusion that a similar difference may 150] exist, as to the *right of making contracts of a particular description. On this head it may be sufficient to say that the whole history of judicial proceedings teaches that there is a difference in the effects produced on society by contracts for contingent rewards, made by attorneys with their clients, and those made by other men in their common business, and that this difference is sufficient to require a different rule. Were it otherwise the discovery would have been made long before now. It would not have been left to the ingenuity of counsel concerned in this cause to bring it to

light. The experience of ages, in countries and states where the principle has been recognized and acted on, would have discovered its fallacy, and it would have been exploded.

Great stress is laid on the supposed fact, that the legislature of Ohio have forborne to legislate on this subject. That they have not said to their courts in a case like this, thus far shalt thou go and no farther, and here shall thy power cease. For a moment admit the position, and what will it lead to? Neither more nor less than that they were satisfied with the common law as it stood, which declared the contract void, and did not think it necessary to super-add in all cases a punishment, by way of indictment. As it had been decided that the common law, although in force in this state, in all civil cases could not be resorted to for the punishment of crimes and misdemeanors, the legislature have provided that a certain species of barratry may be punished by indictment. The fair inference to be drawn from the fact is, that they did not believe it necessary to punish that offense generally by fine and imprisonment, but are willing to trust to the remedy which the common law applied, and which their courts could in part enforce. They might very naturally suppose that the invalidity of the contract, coupled with the power which their courts possessed of punishing acts of champerty done in their presence, as contempts of their authority, would be sufficient to suppress the mischief. But will the gentlemen agree to adopt this course of reasoning in all cases? If we are to look to the statute book as the depository of all the law which we are at liberty to apply, in the administration of justice, what solitary case can be conducted, on legal principles, to a final judgment. Where are we to find the rules of evidence, and those by which contracts are to be construed and enforced? Where is our guide in the application of remedies to particular cases? There is a remedy by the act of the party injured—a remedy by the act of all the parties concerned—a remedy by operation of law, *and a remedy by civil suit in courts [151 of justice. If these can be applied no farther than they are to be found in our statute book, if that alone is the depository of our powers and the manual of our practice, we should soon find the wheels of justice stopped, and injuries without number would go unredressed. There must be rules of law not to be found in that book and courts of justice must have the power of enforcing them, whether they have been formally recognized by the legislature or

not. The want of such a recognition is not of itself a proof of their non-existence. But some inference may be drawn as to the understanding of the legislature, from the terms they have used in the twelfth section of the act which has been quoted. They do not declare it an offense to excite lawsuits, nor do they prohibit it by express bonds. They merely define the punishment that shall be administered, on a conviction by indictment, taking it for granted that the act was in itself illegal. If they had considered the section as creating a new offense, it is probable they would have used the language which is common on such occasions. But without laying any stress on this circumstance, we may safely infer that the existence of the law is no proof of a legislative opinion that such contracts as the one before us were not void at common law.

We admit it to be the policy of our government, that property, illegally withheld from the rightful owner, should be restored. For this purpose courts of justice are established and laws ordained, and if it could be shown that champerty and maintenance were necessary to the due administration of justice, we might be induced to believe that they ought to be encouraged. Our earliest impressions, however, have been that they are not only not necessary, but are highly pernicious. These impressions continue, and have been strengthened by observation and experience. It is probable that this doctrine, at times, may have been carried too far, and that courts of justice, in their zeal to suppress the mischief, have, in some cases, exceeded their proper bounds. It is also possible that contracts exist, of a doubtful character, to which the rule would be applied with some difficulty, as in some of the cases put by the counsel; but a similar inconvenience may attend the application of any other legal principle to certain cases. This, however, would not afford a just ground to deny its existence, nor would it justify a refusal to apply it to cases clearly within its operation. It is unnecessary now to say, whether all or any of the cases put by counsel, for the purpose of illustrating the injustice of the rule, 152] would *or would not be affected by it. Most probably some of them would not. It is our duty to decide the particular case in hand, and to leave others to be settled when they may be presented for adjudication. We can not, however, forbear to remark, that some of the cases put, and others of a similar cast, are said not to be law, and can not mislead. It is laid down, not to be

maintenance for a man to give another friendly advice, or to render him acts of neighborly kindness, in relation to his lawsuits, and that to be blameworthy, he must be guilty of a *contentious, over-busy intermeddling.*

Whatever may be the effect of the sale and transfer of real estate, not in the possession of the vendor, it is admitted that our laws allow the sale of choses in action, and equity will aid in protecting and securing the right of the purchaser; but the analogy between these cases and the one under consideration is too remote to be readily perceived. It is also admitted, that as there is no law prohibiting the sale of a chose in action, so neither is there any regulating the consideration, or the mode of paying it, which is left to the will of the parties. It may be payable in money, property, or personal services, but notwithstanding this admission, we affirm that modes of payment might be stipulated that would be illegal, and that could not be enforced in a court of justice. Instances of this kind will readily occur to every person of reflection. This fact proves, that notwithstanding it is a general rule that men may stipulate for such consideration as they choose, yet the rule has its exceptions, and the case now before us may safely be considered as one of them.

Whatever may have been the merits of the claim set up by Vattier—whatever power he might have had to sell that claim—and although he had an unquestionable right to purchase the professional services of the plaintiff in the prosecution of that claim— yet we can not see the absurdity of saying, that the claim could not be stipulated as the consideration of the service, or the service as the consideration of the claim. To admit this as an absurdity, would be to destroy all distinctions, and to admit that the legality of a transaction is in no case to be affected by a reference to its consequences. The sale of a claim may be perfectly innocent— the purchase of professional services may be unexceptionable, and yet the purchase of those services, by the transfer of the claim, in the prosecution of which they are to be employed, may be highly pernicious, and attended with such injurious effects on society, as to render it expedient to prohibit such a contract. Experience teaches *that such consequences usually attend such con- [153 tracts. Hence the propriety of the restriction in question, while you permit the sale of the claim, or the purchase of the services, as distinct transactions.

We do not admit the conclusions of counsel, that the consequences which these contracts may have on society can not enter into the argument—that they are only to be urged before the legislature, and can not be listened to or regarded by the court. This proposition at once begs the question, by supposing that there is no rule of law on the subject. Were this the case, we admit that the legislature alone could remedy the evil, as the court has no power to introduce a new law, but when a rule of law does exist, applicable to the case, and sufficiently broad to embrace it, it is the province of the court to apply it. They are the tribunal to whom the appeal is to be made, and by whom it must be decided. The legislature may say what the law shall be—the court must say what it is.

But we are told, that to declare this contract not to be void on the face of it, does not include the consequence that all agreements of this nature are to be held obligatory. The proposition is admitted, and although counsel might wish to limit the exception to such contracts as come within the scope of the twelfth section above referred to, yet the court believe it to be much more extensive, and to embrace this case, whatever may have been its actual effect on the parties claiming the property in contest.

Judgment, therefore, must be entered for the defendant on the demurrer, which we consider clearly supported.

The stipulation in the contract, on which the opinion and judgment of the court are chiefly predicated, and to which they have directed it to be confined, is that which prevents Vattier from compromising and settling the matters in controversy, without the concurrence and consent of the other contracting parties. This point being considered sufficient, the court forbear to give an opinion on any other. As the provision, on the subject of cost, is not set out in the declaration, and the defendant has demurred without oyer, that feature in the contract has not been considered.