One of the principal defences set up by the answer in this case is, that "no obligation as of contract capable of being enforced at law or equity arose out of these agreements between Allen McLane and James A. Bayard; that they were honorary in their effect, and imposed no duty cognizable at law or equity;" and, moreover, if not positively illegal, "they were against the manifest policy of law, and especially against the well settled policy of this court and of every other court of equity, and so always repudiated from the assistance of equity to carry them into effect, as tending to champerty and maintenance."
Postponing the consideration of that branch of this defence which respects the obligation of a contract as between client and attorney or counsel, I propose to examine — *Page 208 
What, according to the law of England and of this State, constitutes the offence of maintenance and champerty; whether the prohibitions of that law extend to a class of persons whose profession is to advocate the suits of others; whether the services stipulated by Mr. Bayard, if performed, would amount to an illegal maintaining of the suits in which they were to be rendered; and whether the mode of compensation agreed upon brings the contract within what the law regards as a champertous contract, and prohibits, as being an illegal interference with the administration of justice.
(1. THE CHAMPERTY.) Maintenance, says Hawkins, "seemeth to signify an unlawful taking in hand or upholding quarrels or sides, to the disturbance or hindrance of common right:" (Hawk. PL Crown
393, tit. Maint.,) — "Where one officiously intermeddles in a suit depending in a court of justice which no way belongs to him, by assisting either party with money or otherwise in the prosecution or defence of any such suit." (1 Russell on Crimes
139, 176.)
The terms of this definition obviously do not include all kinds of aid in the prosecution or defence of another's cause; and it has, therefore, always been held not to extend to persons having aninterest in the thing in variance; nor to persons being inany way of kin or affinity to either of the parties; nor to persons acting in the lawful exercise of their profession ascounsel or attornies at law. (Hawkins, 398.) Acts of support and countenance, of aid and assistance, by persons standing in any of these relations to the parties, do not amount to an "officious intermeddling" in the suits; nor "an unlawful taking in hand or upholding of quarrels to the hindrance of right." Such a maintenance is necessary and justifiable. So far from being a hindrance of right, it is essential to the support of right, and the attainment of justice. "And, therefore, it is no maintenance if a counsel takes fees for his advice and assistance;" nor "if an attorney expends his own money for his client, to be repaid." (5Comyn's Dig 19, tit. Maintenance; 2 Inst. 564.)
Champerty is a species of maintenance. It is "a bargaine with the demandant or tenant, plaintiff or defendant, to have part of the thing in suit, if he prevail therein, for maintenance of him in that suit." (2 Inst. 208.) Such a bargain was an offence against the common law; "for the rule of law is culpa est se immiscere rei ad se non pertenenti; and pendente lite nihil innovetur." (2 Inst. 208.) The gist of the offence was themaintenance; the unlawful meddling with another's suit; which was supposed to suppress justice and truth; or, *Page 209 
at least, to work delay: the bargain to do this for a part of the thing in suit was unlawful, and an aggravation of the offence, because of its violation of another rule of the common law, that pendente lite nihil innovetur; which I understand as meaning, not merely that, pending the suit, there should be no introduction of new parties or new interests, but as embracing the substance of the old doctrine thatchoses in action are not assignable; a doctrine long since exploded in England, (4 Term Rep. 340;) and which, if it ever was the law of this State, was virtually repealed by one of the first acts of its Legislature, passed before the year 1736. (1 Del.Laws 117.)
This principle of the common law was connected with the doctrine of maintenance and champerty, and founded on the same reason-Lord Coke says "that for avoiding of maintenance, suppression of right and stirring up of suits, nothing in action, entry or re-entry can be granted over; for so under color thereof, pretended titles might be granted to great men, whereby right might be trodden down, and the weak oppressed." (Co. Litt. 214, a.) "As the entire right of action could not be assigned, so no part of it could be transferred, and no man could purchase another's right to a suit, either in whole or in part. Hence the doctrine of maintenance, which prohibits contracts for a part of the thing in demand, was adopted as an auxiliary regulation to enforce the general principle which prohibited the transfer of all rights of action." (3 Cowen's Rep. 645.) And upon no other reason can we conceive why a bargain for a part, or the whole, of a thing in suit (independently of the maintenance,) should have been an offence at common law. Grant that no such evils flow from the selling a thing in action; grant that such a sale is proper, and may be upheld and enforced by the law; and what conceivable reason is there for saying that a bargain to give a part of the thing in suit, for lawful aid and counsel in the prosecution of such suit, is itself unlawful. But this rule of the common law has long since gone into disuse even in the English courts; if any traces of it remain, it is only for the purpose of giving form to certain kinds of actions. In this country the rule is actually reversed. The laws of alienation in respect to every species of property promote its transfer as more consistent with the condition of things here, and with public policy. By our law the transfer of a thing in action, or of part of a thing in suit, may be made; and, by the common law, it is lawful for attornies and counsel in the regular exercise of their profession, to maintain the suits of others. If the service, therefore, be lawful, and the *Page 210 
mode of compensation be now lawful, how can such a contract be champertous and unlawful?
Mr. Justice Buller says, in the case of Master vs.Miller, "It is laid down in our old books that for avoiding maintenance a chose in action cannot be assigned, or granted over to another. (Co. Lift. 214, a.; 2 Roll. 45, l. 40.) The good sense, he remarks, of that rule seems to me to be very questionable; and in early as well as modern times it has been so explained away, that it remains at most only an objection to the form of the action in any case. It is curious and not altogether useless, to see how the doctrine of maintenance has from time to time been received in Westminster Hall. At one time not only he who laid out money to assist another in his cause, but he that by his friendship or interest saved him an expense which he would otherwise be put to, was held guilty of maintenance. (Bro. tit. Maint. 7,
14, 17, c.) Nay if he officiously gave evidence it was maintenance; so that he must have a subpoena, or suppress the truth. That such doctrine, repugnant to every honest feeling of the human heart, should be soon laid aside must be expected." (4 Term Rep. 340.)
The first English statute against champerty was the Stat.Westm. 1, ch. 25; 3 Edw. 1, Anno 1275. It provided that no minister of the king should maintain tohave part; upon which the learned commentator says, "hereby it appeareth that it is no champerty unless the state, c., be made formaintenance." This statute was confined to the king's officers; but the statute articuli super chartas, 28 Edw. 1,ch. 11, Anno 1300, extended to other persons, with this proviso in the body of the act; "but it may not be understood hereby, that any person shall be prohibited to have counsel of pleaders, or of learned men in law, for his fee; or of his parents and next friends." (2 Inst. 563; 2 Hawk. 409.) Then came the statute dc defnitio con-spirit' 33 Edw. 1, st.
2, Anno 1305, which particularly describes the offence of champerty. "Campi participes sunt qui per se vel per alios placita movent, vel moveri faciunt, et ea suis sumptibus prosequuntur, ad campi partem, vel pro parte lucri habend." (2 Inst. 208; 5Com. Dig. 15.) Champertors be they that move pleas and suits, or cause to be moved, either by their own procurement or by others, and sue them at their proper costs, for to have part of the land in variance, or part of the gains.
By this reference to the English statutes it appears, 1st. Thatillegal maintenance was still at the root of the whole matter; there being *Page 211 
no champerty, as lord Coke says, "unless the" state, c. (that is, the agreement to divide the estate,) be made for maintenance;
2d. That the proper advocacy of causes by persons belonging to the legal profession, was not maintenance; and 3d. That there was something in the state of the times about the beginning of the fourteenth century, which required that penal sanctions should be added to the common law prohibitions of maintenance, and especially against a kind of champerty then very common among men of wealth and power, including the king's ministers and other high officers of state. In Hume's history of England, 2 vol. 320, this state of society is presented. Referring to the reign of Edward the first, and particularly to this statute of conspirators, he says: "Instead of their former associations for robbery and violence, men entered into formal combinations to support each other in lawsuits; and it was found requisite to check this iniquity by act of parliament."
Principles having their birth in such a state of society, and designed to meet a particular evil of the times, cannot have application in all time to come, and under every change of circumstances. They no longer apply even in the country where they had their origin. Instead of combinations of men formed for the purpose of carrying on suits to the "suppression of justice and truth," embracing even the king's ministers, judges and other officers of the law, the fountains of justice have become so purified, and its channels so incorruptible, that men no longer rely on wealth to purchase justice or power to overawe those who dispense it, and no longer apprehend the influence of either in perverting right. With the evils of the old times the remedies provided against them have become so modified and changed that, as Judge Buller says, it is matter of curiosity to see how the doctrine of maintenance has from time to time been received in Westminster Hall.
These statutes of Edw. 1, seem to have introduced a new feature into the definition of champerty. The evil which they were designed to meet was the conveyance of pretended titles, by those who were unable or unwilling to incur the expense of prosecuting them, to men of wealth and power, who should carry on the prosecution at their own expense, and divide the proceeds. It was a maintenance, not only by influence and power, but by the actual means of conducting the suit; and that on a contract for a part of the thing in action, which by the common law was itself unlawful. Hence, says the statute, "Champertors be they that move pleas and suits, or cause *Page 212 
to be moved either by their own procurement or by others, and suethem at their proper costs, for to have part of the land in variance, or part of the gains."' This important ingredient of paying or contributing to the expenses of the suit, seems ever since to have been regarded as essential to constitute the offence of champerty; being introduced into all the elementary works of authority as a. part of the definition. Thus in 4 Blac. Com. 135, to which our act of assembly of 1826 refers, the offence is defined to be "a bargain with a plaintiff or defendant, campum partirc, to divide the land or other matter sued for between them, if they prevail at law; whereupon, the champertor is to carry on the party's suit at hisown expense." This is an important matter in reference to the present case. If the payment of expenses be necessary to constitute the offence, that ingredient is wanting in this case, and the bargain is not champertous, any more than the services stipulated for are maintenous, which they clearly are not.
The payment of expenses is no part of the business of a lawyer under our practice. In England the attorney has also the character of agent, and he may, therefore, pay even the expenses of a suit without being guilty of maintenance. (5 Comyn's Dig. 19.) This not only shows the distinction between lawful and unlawful maintenance, but illustrates the reason why the payment of costs by an attorney here would make a contract champertous, which would otherwise be lawful. In the payment of costs, or by agreeing to pay them, he acts out of his character as a professional man, and maintains the suit in a way which that character does not justify. But so long as his contract stipulates only for such services as he may lawfully render without being guilty of maintenance, it is not vitiated on any ground of champerty, because those services are to be requited out of the thing in suit, which by our law is a proper subject of contract.
This view accords not only with the universally received opinion
of the profession, and I may say the practice of the profession in this State, and in other States; (9 Law Lib., Ram, on legal judgt.
12; 1 Harr. Rep. 560;) but it has received the sanction of judicial decision in courts of the highest American authority. I extract from the unanimous opinion of the Court of Errors in New York, in Thallhimer vs. Brinckerhoff, (3 Cowen'sRep. 643:) "Champerty, maintenance and barratry, were defined as offences in very early stages of the English law. These practices seem to have been then common in England, and they were denounced, not only as sins very heinous in them-selves *Page 213 
and highly injurious to the peace of society, but also as offences which actually interrupted the course of public justice. The excitement of suits is an evil when suits are unjust: but when right is withheld, and the object of a suit is just, to promote the suit is to promote justice." "Where the administration of justice is firm, pure and equal to all, and where the laws give adequate redress for groundless suits, it is not easy to conceive that mischief can arise from opening the courts of justice to all suitors, or from contracts by which the fruits of a suit may be divided between him who has the right of action, and him who has contributed advice, expense or exertion, to institute the suit or prosecute it to effect." "If principles are considered, it seems to be of little moment whether he who maintains the suit of another receives his reward from the subject of the suit, or from any other property of the suitor. Champerty is one species of maintenance; but the authorities do not declare contracts for a part of the thing in. demand universally unlawful. The distinction made by the books between interference which is illegal, and that which is lawful, consists in the rule and the exceptions stated; and where maintenance is lawful, as in the case of interest in the subject or relation tothe suitor, a contract to divide the subject of the suit, which is maintenance in a particular form, is also legal."
These views so ably supported in the case referred to, and extending the general principles beyond what is necessary to support the contract in the present case, are not satisfactorily answered in the reasoning or by the authority of any of the cases here cited for the respondent.
The case of Arden vs. Patterson (5 Johns. Ch. Rep.
44,) was the case of a purchase by an attorney, for a very inadequate consideration, of the whole matter in litigation; a purchase from the assignees of an insolvent plaintiff who had no knowledge of the grounds of the claim, and after one trial had resulted against them. It was not the case of an attorney contracting to prosecute a suit for his client and to be remunerated out of the proceeds of that suit; but of an attorney purchasing on speculation, from persons who were not his clients, the whole of a claim considered by them desperate, to be prosecuted entirely for his own benefit, and at his own cost. The facts were these: G. De Peyster had deposited thirteen pipes of wine with Arden as a collateral security for the payment of $4,000. He became insolvent, and assigned his effects to Sullivan and Roc, in trust for creditors. The assignees brought suit against Arden for the wine, and were nonsuited for want of proof to support their title; and subjected *Page 214 
to the payment of costs, amounting to $350,00. The demand was then given up as hopeless. The defendant, Patterson, who was an attorney at law, and had been previously instructed by De Peyster in the merits of the controversy relative to the wine, now bought the right of action of the assignees for the amount of the costs in the first suit; brought his action in the name of Sullivan and Roe, but for his own benefit, and at his own risk, and obtained a verdict for near $6,000. The bill was filed by the assignees to set aside the assignment to Patterson as fraudulent, and to have the benefit of the verdict for De Peyster's creditors. The whole transaction, as to the attorney, was of course declared to be fraudulent and void; and it can scarcely be necessary to compare such a case with a bona fide contract between counsel and client, the one to render service in conducting a cause, and the other to pay for such service out of the proceeds or avails of such suit.
The case of Swett vs. Poor (11 Mass. Rep. 549,) was the purchase, for $250, of one thousand acres of land, worth from three to four thousand dollars, from the heirs-at-law of a man from whom the land had been sold in his lifetime, and who died disseized thereof, and had been disseized for nearly thirty years. The purchaser commenced suits in the name of the heirs, but entirely for his own benefit and at his own cost; and, pending the suits, the heirs-at-law conveyed to the tenants in possession. Whereupon, the purchaser of this dormant claim brought his action on the case against the heirs for thus stepping in between him and the fruits of his fraud. He was nonsuited; the court regarding the whole transaction as a gross act of maintenance. It was not so strictly maintenance as it was an unlawful buying up of a title, "the purchase of a dormant title, from a party not seized, by a stranger out of possession," which was an offence at the common law. (2 Hawk. PLCrown, ch. 86.) And upon this principle were decided the other cases cited of Evcrenden vs. Beaumont (7 Mass. Rep.
76,) and Walcot vs. Knight. (6 Mass. Rep. 418.)Jackson vs. Ketchum (8 Johns. Rep. 374,) was the buying up of a title not only after suit brought, but after verdict recovered against the vendor at the suit of a stranger. It differs in some respects from the other cases; but, without going into detail, it is sufficient to say of this case, that it was cited and reviewed in Thallhimer vs. Brinkerhoff, already referred to, and of course overruled, if there be anything in it at variance with the principles of the latter case. *Page 215 
There remain but two of the American cases which were cited for the respondent on this point. The first is Thruston vs. Percival
(1 Pick. 415,) which was an action of assmnpsit by an attorney "'for work and labour, services and journeys performed, moneyexpended," c. The plaintiff was an attorney and counsellor in the Massachusetts courts, and made a contract with defendant to aid him in recovering a large sum of money in a suit to be prosecuted in the State of New York, and to be compensated by a share of what should be recovered; but he did not act as advocate in the cause; not being allowed to do so by the laws of New York. This contract was adjudged champertous: but, if we admit the authority of the case, a distinction is apparent, as the plaintiff acted out of the line of his duty as a professional man in advancing the suit, and was, therefore, guilty of maintenance on principles before stated. His action was for work and labour, services and journeys performed, and money expended.
The other case was that of Key vs. Vattier (1Ohio Rep. 132,) which was on a contract between an attorney and his client to prosecute suits for certain property, to pay all the costs, and to be compensated by one-half of all that should be recovered; and in which the client stipulated that no compromise should be made unless the attorney joined in it. The court declared the contract champertous, resting their judgment chiefly on the provision which prohibited the client from compromising his own claim; a matter which they evidently considered as not protected by the attorney's privilege to maintain the suit. There was abundance of other matter in the case to vitiate the contract, if it had been brought up by the pleadings; such as the agreement of the attorney to carry on the suit at his own expense, which the court notice but do not rest upon because that matter was not properly presented. The case does not pretend to controvert the principle, that an attorney may prosecute suits without being guilty of maintenance; nor to decide that a contract to be paid for such services out of the matter in suit is necessarily champertous.
The earliest legislative act of this government on the subject of maintenance and champerty is the act of 15 Geo. 2, Anno.
1742, (1 Del. Laws 239.) It does not define the offence; but refers, generally, to the common law, and the statute laws, of England. At that day the ancient doctrine of the common law on this subject had undergone a very great change in the courts of England, even to the subversion of fundamental principles. The doctrine thatchoses in action *Page 216 
could not be assigned began to give way as early as the 41st ofEliz., Anno. 1599, (1 Roll. ab. 29, pl. 60;) was no longer regarded as a principle having any substantial efficacy in 1701, (Rev. vs. Inhab. De Aicles, 12 Mod.
554;) and was finally treated by all the judges of England inMoulsdale vs. Birchall, (2 Wm. Blac. 820,)Anno. 1772, as entirely exploded. Our own act "for assigning bills and specialties," (1 Del. Laws 117,) was passed between the years 1726 and 1736, many years before the act of 15 Gco.2. We take it for granted, then, that the principle on which the ancient common law doctrine of champerty seems to have been founded, never had an existence in our State; that in England this offence had no other basis in the year 1742, than the statutes of Westm. 1 and 2; 28 Edw. 1, and 33 Edw. 1, to which alone we are to look for the character and qualities of the offence prohibited by our act of 15 Geo. 2. We are authorized to assume this, not only because of the change that had taken place in the principle upon which we suppose the offence of champerty at common law to have been based; but because lord Coke has expressly declared that the statute of Westm. 1, was the "foundation of all the acts and book cases that ensued." (2 Inst. 209.) But we have seen by reference to the 33 Edw. 1, that the agreement prohibited by these statutes as champerty, was one which bound the champertor tomaintain the party's suit at his own expense; which it cannot be shown that Mr. Bayard was to do in this case. It has been argued, indeed, that the bill made out this ingredient by an admission that complainants were bound for, and an offer to pay, a portion of the costs in the suit of Allen McLane against the United States; but the question is not what the complainants offer to do, but what the agreement bound Mr. Bayard to do. Looking at the terms of that agreement, it is impossible to say that they imposed on Mr. Bayard any obligation to pay costs, or to do any other act which he might not do in his character of counsel and attorney. The offer of the bill proceeds on an entirely different supposition from that of obligation arising from the contract. Treating the suit of Col. McLane against the United States as a new proceeding, it admits the liability for costs on the ground of a community of interests in the thing sought by that suit.
We conclude then on the first point; that it is not maintenance
for a lawyer in the State of Delaware, to render service as counsel in prosecuting or defending causes; and that a fair, bone fide andreasonable contract with his client to be remunerated for such services out of the thing in suit is not champerty, nor does it tend to champerty. *Page 217 
That which is not champerty at law, cannot be champerty in equity. That which if carried out to the full extent will not amount to champerty, cannot be said to tend to champerty: and the meaning of the authority which decrees a contract void because it savours of champerty is explained to be that it carries a strong presumption of this offence; such a presumption as a court of equity may act upon as proof. (18 Ves. Rep. 126.) But there is no such presumption to be entertained in reference to the contract in this case. There is nothing in the stipulated service that the law ever prohibited, and nothing in the mode of compensation that violates any principle of law or morals. Whilst the law permits a claimant or plaintiff to sell the subject of his claim; to transfer and assign his cause of action in the whole, or part; we cannot conceive why he should not sell it to his lawyer as well as to another, and for legal sendees as well as for any other consideration; if it be also conceded or shown that such services in this state may be a legal consideration for a contract; and that there is nothing arising out of the relation of attorney and client, that prevents the making of contracts between them. This, therefore, is the subject to which we shall next direct our attention.
(2. ATTORNEY AND CLIENT.) That an attorney at law can recover in the courts of this State a reasonable compensation for professional services can hardly be considered a question open for discussion. It has been often decided incidentally by our courts, and particularly by the chancellor sitting in the Orphans' Court on appeal from the register. Very few estates of any magnitude are settled before the register without the direct allowance of counsel fees as a proper payment by the administrator; and the same charge must have passed through the appellate court as often as an appeal has been taken from such settlements. The question has no doubt arisen in the same incidental way in the late Supreme Court, on appeal from the Orphans' Court. It has on several occasions been directly decided by the Superior Court. In the case of Stevens vs. Monges, (1Harr. Rep. 127,) a recovery was had for a counsel fee in an action of assumpsit, on the general counts; the court saying they had no doubt on the question. And a case to the same effect was cited from the District Court of the U. States for this district.Davis vs. Walker's adm'r. (2 Harr. Rep. 125,) went to the same point. The register of wills in settling an administration account, had allowed the administrator a credit of $50, for cash paid a solicitor for conducting a suit *Page 218 
in chancery, in which AA filter's estate was interested; and, on appeal, the chancellor sitting alone in the Orphans' Court, reduced this credit from $-50 to $13 33, the legal fee for appearance. The administrator appealed to the Superior Court, which, after hearing argument on the point now under consideration, reversed the decree of the Orphans' Court, and made a direct allowance to the administrator of the whole sum paid by him to the solicitor. In Rogers vs. Randel;
and Read's adm'r. vs. Randel; at May term, 1839, (2 Harr.Rep. 449 500,) large sums were recovered for counsel fees. It is true that in these cases recovery was had on the quantum meruit, but it was not questioned that if professional services formed a consideration from which the law would imply a promise, and upon which a recovery could be had in general indebitatus assumpsit; they would also form a consideration for a valid contract, and be recoverable on the footing of a special agreement. Indeed, in the two last cases, there was a count on a special contract, which was not objected to on this ground; but the proof of the contract failed, and the plaintiffs had to resort to the common counts. These cases, therefore, recognise the claim of an attorney at law for professional services as a legal demand. On the same principle it has frequently been decided, that physicians can recover compensation for medical attendance and skill, though these also in England, stand on the same footing with counsel in reference to compensation. And there is no difference in this respect among us between the fees of counsel and of attornies. In common speech there may be a distinction as to the kind of service to be done, but the laws of this State recognise no grades in the legal profession, and furnish no other distinctive title for a lawyer than that ofattorney at law. As such he is admitted to practice in all the courts; as such he is sworn; and in virtue of this admission he may perform the duties of counsellor and advocate as well as the more appropriate duties of an attorney, according to the distribution of functions under the English practice.
This striking distinction between their system of administering justice and ours, both in reference to the character. of the law agents and their mode of compensation, must be kept in view whilst considering the rights and duties of counsel as such, and the restrictions that are said to grow-out of the relation of attorney and client. It has an important bearing on the question of champerty already considered, but not particularly presented in this view: for in addition to the common law restrictions on the assignment of things in action, *Page 219 
there was also an incapacity in counsel to make any contract with his client, much less a contract for a share of the thing in suit; and the same was true of the attorney who could make no other contract with his client than that which the law had already made for him in assigning to every service its fixed and appropriate compensation. This absolute incapacity of contracting with each other placed the attorney and client in the same category with husband and wife, guardian and ward, master and servant; between whom no dealings can take place having the sanctions of legal obligation.
Without recognizing any such distinction, the chancellor rests his decree in this cause, mainly on the principle that no contracts can be allowed between counsel and client during that relation.
The English doctrine on this subject is founded on considerations ofpublic policy; which, in general, is one of the most uncertain and therefore unsafe grounds of legal judgment. Doubtless where the policy is clear it is a good ground of decision, but like all arguments ab inconvenienti, of which it is one, the weight and even the existence of the inconvenience may be doubtful, or may be counterbalanced by a greater inconvenience on the other side. (Ram. on legal judgt. 57.) It is also an unstable ground of judgment, varying with the conditions of the same community, and applicable only to communities similarly situated. The policy of the law springs out of the condition of the people who are to be bound by it. In England it has been deemed against public policy to permit counsel to contract with their clients for compensation, first, because of some vague notion that it would be against the dignity of the profession to demand fees; and, secondly, from the apprehension that clients might be oppressed by such bargains; yet, whatever is the theory, we know that in point of fact the counsel does take fees under the polite name of honoraria; nay more, that, being unable to recover anything by the aid of the law, he requires the cash in hand before he opens his mouth in the cause. Is there no doubt about the policy of a principle that operates thus? Is there less danger of oppression of the client in requiring payment of the money down, than by taking his contract or bond? The lawyer in either case makes his own terms, which the client either agrees to or employs another. But the poor suitor may not have the present means of payment, and this policy may deprive him of counsel. He may have credit — credit founded even on his rights in the suit which he is about to prosecute — credit especially with the lawyer, who understands those rights; but for want of the *Page 220 
money to pay clown in advance, the courts of justice may be effectually closed against him. His rights are nothing unless he can have the means of enforcing them. Reverse his case; make him a defendant, and he is in a still worse condition. His more wealthy opponent brings suit against him; makes heavy claims, though possibly on slight grounds; his credit is destroyed by the very suit that threatens to take away his means of payment; he cannot raise money, and he cannot defend himself against oppression. He cannot have justice, being unable to pay for it in advance, and this public policy prevents those from trusting him whose services are as essential to him as even the truth and justice of his cause. It is a principle which, like many of the doctrines regarding the titles to and transmission of property, having their origin in feudal times, tends to strengthen the strong hand at the expense of the weak, to whom it might, in many instances, amount to a denial of justice. Is there no doubt about the application of such a principle to our community? Is it so clearly our policy as to make it a safe ground of legal judgment? In this country whose boast is of equal rights; in this trading community whose laws facilitate and promote the change of property with all its incidents of bargains and lawsuits, public policy, so far from restraining litigants and throwing obstacles in the way of obtaining justice, tends directly the other way. The inconvenience of requiring the payment of counsel in advance, is stronger than any danger to be apprehended from permitting contracts between them and their clients. We equally reject the notion, that it is any disparagement of counsel to place their compensation on the ground of contract. The profession in this country make no ridiculous claim of being the patrons of their clients; they are, as one of the most distinguished of them remarked in the first argument of this cause, "the servants of their clients, their servants, not to do their will, but to do their work," they work not for the honorarium but for the stipendium, and having earned their fee it is their right, and no disparagement of their dignity to demand it. Among us there is no such immeasurable distance between the attorney and his client, and no such "crushing influence" as is represented to exist elsewhere. The client is as necessary to the attorney, as the attorney to the client. The influence of the latter is generally as powerful as that of the former. He has his bar of counsel sufficiently numerous for all purposes of selection, all dependent on character for patronage, and as a class more directly responsible to public opinion, to say nothing of their responsibility to the court, than *Page 221 
any other profession. If elsewhere there be this overpowering influence exercised by counsel over their clients, it is well that the law has there put suitors into wardship to their counsel, and thrown around them the disabilities of infancy. But if our law regards the client as a man, capable of judging and acting for himself, as it does by allowing him to contract with his attorney, there is as little reason to protect him against the attorney as the attorney against him. Watchful alike to protect either against oppression or fraud, the law leaves them as to all their fair, bona fide contracts, as it does all other men, and there is no occasion for any other protection. It is not true in point of fact, that there is so much danger of oppression on the part of lawyers, as to make it necessary to prohibit all dealings between them and their clients. Instances may no doubt occur among them, as with all other men of hard dealing, perhaps of fraud and oppression, but these are the exceptions; these are the very cases that the law will not countenance. The question is not whether a" court of law or equity will enforce such a contract between attorney and client, but whether there is among us anything growing out of the relation of attorney and client, that, as a matter ofpolicy, should prevent a court of equity from decreeing the performance of a fair, bona fide and reasonable contract made by a client with his attorney. In our view this question is settled by authority; by the decisions in our own courts; but, as a new question, we can see nothing in principle or in policy that should take from such agreements the obligatory force of contracts.
If this be true as a general principle, it is eminently so when applied to the present case; to a contract between James A. Bayard and Col. Allen McLane; — the one an eminent attorney and honorable man, the other his friend and equal; the client in all respects as able to take care of himself in a bargain as the counsel. If a principle is to be tested by its application to an extreme case, the fallacy of this ground of the defence could not be more forcibly illustrated than by the supposition that public policy would not permit Allen McLane to make a contract with James A. Bayard for professional services, because of the overpowering, crushing influence that this relation, then just springing into existence, gave Mr. Bayard over him. Such a principle will not do. A vitiating influence does not necessarily grow out of the relation. If any such exist in the particular case so as to produce oppression or fraud it must be shown; if it be not shown the court has only to inquire, is the contract fair *Page 222 
and just; is it reasonable; has it sufficient consideration, and has it been performed?
We remark, also, but without laying much stress upon the fact, that this contract was not made during the relation of attorney and client, nor pending the snit in reference to which it was entered into. Col. McLane was not "in the hands" of Mr. Bayard, according to the strong expression of one of the cases. No suit had been commenced. The contract itself originated the relation of counsel and client; and the "crushing influence" began when the contract was made. It is not the case of Saunderson vs. Glass,
(2 Atk. Rep. 310,) where a solicitor induced a married woman, parted from her husband, to make him an absolute conveyance of £1,000, "in consideration of services done and favors shown;" and, even in that case, the court allowed the deed to stand good for any sum actually due to the attorney for his lawful fees. Much less is it the case ofWelles vs. Middlcton, (Cox's Ch. Rep. 112,) where an attorney, after making a will in his own favor, took adeed from a poor man, seventy-two years old, who was "extremely dissipated in his habits," for the whole of a large fortune which had just fallen to him. Doubtless there was a "crushing influence" in these cases, such as ought to set aside any contract; but such instances do not establish the policy of excluding contracts in all cases of attorney and client. The later case ofWood vs. Downes, (12 Vesey 119,) cited by the chancellor, whilst it decrees against a conveyance obtained by an attorney from his client, retains the instrument though "liable to imputation for champerty" as a security for whatever should be due to the attorney for fees and disbursements.
(3. CONSTRUCTION OF THE CONTRACT; AND PERFORMANCE.) The contract in this case was made in reference to certain ships and goods seized by the collector of the Delaware district for a violation of the acts of Congress, usually called the non-intercourse acts. The first contract, dated 21st April, 1812, relates in terms to the ship Good Friends, or to that ship and cargo. Reciting, that the collector had "seized as forfeited under the laws of the United States the ship Good Friends, Robert Thompson, master, now lying at New Castle, belonging to Stephen Girard of Philadelphia," it was "agreed between the said parties that the said James A. Bayard shall render his services as counsel in the courts of the U. States, for the purpose of obtaining the condemnation of the property seized as aforesaid, and in consideration thereof, the said A. McLane agrees and promises to *Page 223 
pay to the said J. A. Bayard, one moiety or half-part of what may be finally recovered under or by virtue or in consequence of the said seizure, and the said J. A. Bayard agrees, in case nothing be recovered, to demand no compensation for any services he may render." This contract was on the next day "upon the request of Mr. McLane" so far varied, that Louis McLane should be considered as one of the counsel "in the case relative to the Good Friends," and should divide with both the said parties, so that each should be entitled to one-third of what might be recovered; the whole amount recovered to be divided in three equal parts. And on the 8th of May, 1813, Allen McLane made and signed the following indorsement on the contract of the 22d of April, 1812: "I agree that the within arrangement shall apply to all the Amelia Island cases which were pending at the date thereof."
The Amelia Island cases referred to in this indorsement were the cases of the ships Good Friends, United States and Amazon; so designated because those ships, coming from British ports with prohibited cargoes, had stopped at and cleared from Amelia Island, in East Florida, then in possession of General Matthews, under assumed authority from this government. These ships all arrived in the Delaware, and were seized by the collector, about the same time, to wit: the Good Friends on the 19th; the Amazon on the 20th, and the United States on the 23d of April, 1812. They were libelled in the District Court on the 5th of May. The case of the first ship was argued by Mr. Bayard in November and December of the same year; and the court, on the 15th of March, 1813, entered a decree of forfeiture and condemnation. The libel against the cargo proceeded to a decree of forfeiture and condemnation on the 17th of April, 1813, without any other argument on the main question than that which took place on the libel against the ship. From both of these decrees appeals were taken to the Circuit Court, where they remained without active prosecution until September, 1818, when the decrees were affirmed, subject to certain remissions from the treasury. The cases against the ship United States and her cargo remained in the District Court until June, 1821, when there was a decree of condemnation; and in the other cases there never was any decree, the same having been settled under the remissions. James A. Bayard left the United States on the 9th of May, 1813, and never returned, but in a dying condition.
On this state "of facts immediately connected with the contract, *Page 224 
the first question to be considered is whether it embraced the cases of all three of the ships and their cargoes, so as to entitle Mr. Bayard to compensation from all the Amelia Island cases for any service rendered by him. We think it did not. The contract of 21st and 22d of April has no reference to any other seizure than that of the Good Friends, and there is no evidence of any agreement as to the other cases until the memorandum indorsement of the 8th of May, by which Mr. McLane agreed that the arrangement of the 21st and 22d of April should apply to all the Amelia Island cases which were pending at the date thereof. Taking this strictly it could apply to none of the cases, as there was no case pending, and no libel filed, until the 5th of May, and even the seizure did not take place in the case of the U. States until the 23d of April; but, supposing it to refer to all the Amelia Island cases in which libels were filed about the 5th of May, had this memorandum contract reference to services already performed, or was it on an executory consideration? So far from there being satisfactory evidence of an executed consideration, and of a previous understanding between the parties of which this memorandum was intended to be the evidence, the proof is against such a presumption. The letter of Mr. Bayard to Spackman, of the 16th of May, 1812, admits an engagement with him as informer in the cases of the Amazon and U. States. If he had, previously to this, been employed in these cases by Mr. McLane, how could he have taken Spackman's fee as an informer? In the one case the forfeiture would belong to the collector alone, in the other to the informer and collector. And he says, "the collector applied to me to be concerned for the government against the Good Friends. The application was entirely consistent with the service I expected to render you. The service in both cases would be directed to a condemnation, and the particular interest of informer had no connection. with the general system of condemnation." This was true if the service was to be rendered to the informer and collector in different cases, for condemnation was alike sought in both; but how could it be true that the service of the one was entirely consistent with a service of the other in the same case. The libels filed by the collector stated the seizures to be upon his own knowledge, entitling him to one-half the forfeiture, the service of the informer in the same case would necessarily resist this and set up a claim for him, as against the collector, for a share of the forfeiture. He proceeds to say — "when I found Messrs. Thompson Maris concerned in the cases in which you had *Page 225 
retained me, I thought I could render them important service here under their petition, which would be in no decree repugnant to the duty I should owe the collector in the case of the Good Friends,
which was likely to take a very different direction. As it seems, however, that Messrs. Thompson Maris mean to set up a defence
against the forfeiture and not to have recourse to a petition, it is very evident that I cannot serve the collector and them at the same time." That is to say, though the collector had employed Mr. Bayard to procure a condemnation in the case of the Good Friends, he felt himself at liberty to take Spackman's fee as informer with a view to condemnation, in the cases of the Amazon and U. States, or even to solicit at the treasury in behalf of Thompson Maris, a remission in those cases; because remission proceeding on the idea offorfeiture did not oppose the ground he was hound to take for the collector in the case of the Good Friends. How could Mr. Bayard after being retained by the collector to procure condemnation of the Amazon and U. States for his benefit, have taken either the retainer of Spackman as informer, or have solicited remission at the treasury for Thompson Maris? Supposing him unemployed in those cases by McLane, the service to Spackman, or to Thompson Maris was, as he says, consistent with his duty to the collector in the other case. But when he understood that Thompson Maris intended to set up a defence against the forfeiture, all three of the cases stood so similarly situated in reference to this question, that he could not argue for the forfeiture in the one, and against it in the others. The last sentence of this letter as originally written by Mr. Bayard, and now erased, would be conclusive on this question. It now reads, "My engagement with you I shall of course consider at an end." It was first written, "My engagement ending with you, I shall of course consider myself at liberty to accede to any propositions on the other side." "Why this was changed it is useless now to conjecture; but the reflection naturally arises, who was the other side? He stated himself not to he at liberty to serve Thompson Maris, the claimants of these ships and cargoes; the other side, therefore, was the collector, or the U. States. If we are permitted to remove the veil which Mr. Bayard imperfectly drew over this part of the first draft of his letter, there can be no doubt that, at its date, there was no understanding between him and Col. McLane in reference to the Amazon and U. States. What satisfactory evidence is there that there was any such agreement prior to the 8th of May, 1813? Two letters *Page 226 
from Mr. McLane to Mr. Bayard are relied on as showing an agreement, but the expressions in both of them are incidental, and too loose as the evidence of a contract. On the 13th of January, 1813, Col. McLane writes, "I have returned from a visit to Philadelphia. The first bonds in the Amelia Island cases became due last Saturday for duties, and I have collected them without any other difficulty than the trouble and expense of a visit to the concern." Now Mr. Bayard was employed in the case of the Good Friends, and therefore interested in the subject of this communication, and the mention of bonds in the Amelia Island cases generally, does not necessarily admit his interest in all of them. It is entirely too loose to infer the acknowledgment of a contract in reference to all of the cases. The letter will not bear the gloss hesitatingly ventured upon in the argument, to wit: that the duties had been collected without other difficulty to the concern than the trouble and expense of a visit. This might strengthen the inference somewhat, but it is obviously not the meaning of the letter. The "concern" refers to the importers, to those from whom payment of the duty bonds was received. We do not attach any greater weight to the letter of the 9th of February, 1813. In that letter Col. McLane, speaking of the seizure of another ship, the "Tiber," which he says belonged to the same concern that were interested in the shipments last April, retains Mr. Bayard in this case also, and says, "you shall be recompensed and interested as in the Amelia cases." This expression, if it be the language of the-letter, which is hardly legible, is subject to the same general remark that I have applied to the letter of the 13th of February, to wit: that Bayard was interested in some of the Amelia cases, and it will not do to construe loose expressions in a letter which may be satisfactorily applied to a known agreement, into the admission of a more extensive agreement, embracing other matters. If then, there be nothing out of the memorandum contract of the 8th of May, showing that it was the recognition of an antecedent agreement, and founded on an executed consideration, there is as little to be found in the terms in which it is expressed. The agreement is present, and its terms executory and prospective. "I agree that the within arrangement shall apply to all the Amelia Island cases;" that is to say, that J. A. Bayard shall render services as counsel for the purpose of obtaining condemnation of the Amazon and U. States, and in consideration thereof, I agree to pay him one-third part of what may be finally recovered. But if there was no agreement relative to the Amazon and *Page 227 
U. States before this memorandum, it will be conceded that as Mr. Bayard never rendered any service under it, it is of course without any consideration upon which to found a claim for compensation. The argument in the case of the Good Friends, though that argument might have applied equally to the other cases, and have had great influence in producing condemnation or its equivalent in all the cases, would not be a good consideration for the subsequent promise to share the proceeds of those cases. All the service that was rendered was due to Col. McLane under the contract of the 21st and 22d of April, to be remunerated as therein agreed; the incidental benefit resulting to the collector in other cases similarly situated, was an advantage he was entitled to under his former contract. Neither would the loss to Bayard from being unable to take Spackman's fee form a consideration for the subsequent promise, as this was a necessary consequence of the contract of April, and is so in every contract between attorney and client, that the attorney shall not take a fee on the other side of the same or any other cause involving the same general questions. The memorandum contract then, of May, 1813, not being the evidence merely of a prior agreement, of which there is nothing to satisfy our minds that it was, but being a contract in verba præsenti, executory in its nature and prospective in its purposes, was a contract without consideration other than what should arise from the performance of the services for which it stipulated, which services in the whole or part were never rendered.
We come, then, to a, construction of the contract of the 21st and 22d of April. What rule of construction shall we apply to it? Whatever rule we adopt must be held throughout, and applied as well to theservice to be rendered, as to the subject of the contract, and the source of compensation. What rule shall we take? Shall we confine ourselves to its words and refuse to look at the circumstances around the parties when they made it, the apparent objects in view; or shall we regard those circumstances and objects as giving force, extent or restriction to the words used. We will test it, first by this rule of construction; remarking that if, in any case, it be permitted to travel out of the contract to ascertain the meaning of the parties, it would be proper in reference to such a contract as this; one which the courts look upon with jealousy; a contract not tolerated by the English courts either of law or equity, and only tolerated here with such restrictions as the court can
impose upon it for the client's protection. To say that a court of equity shall be confined *Page 228 
in construing such an agreement to the very words the lawyer has used in drawing it up, without regarding the manifest object of the parties, would be to give up the restriction always imposed on contracts between attorney and client, that they must be reasonable.
The contract, (as modified,) reciting a seizure of the ship Good Friends, as forfeited for an illegal importation of merchandise, specifies an agreement between the parties, that Mr. Bayard should render his services as counsel in the courts of the IT. States, for the purpose of obtaining condemnation of the property seized; and, in consideration thereof, should receive one-third part of what should be finally recovered under, by virtue, or in consequence of the seizure; and should receive nothing in case nothing should be recovered. Construing this agreement by the principle stated, in reference to the condition of things existing at the time, and the manifest intent of the parties; we are to inquire, first, whether it covers the cargo of the Good Friends as well as the ship herself. We think it does. At the date of that contract the libels had not been filed; no necessity had occurred of distinguishing between the ship and her cargo, in speaking on the subject. A seizure had just taken place; it was comprehensively stated as a seizure of the ship as forfeited; forfeited because of the prohibited goods which she contained; and Mr. Bayard was retained for the purpose of procuring condemnation of the property seized as aforesaid, and was to be compensated out of what might be finally recovered in consequence of the said seizure. And, as the goods with which she was loaded were in this case necessarily included in the seizure of the ship, so it was impossible to procure condemnation of the ship, without a condemnation of the goods. By the fifth section of the act of 1809, (4 U. S. Laws 212,) the importation of prohibited goods, or the putting them on board ship, with the intent to import them, occasioned a forfeiture of the goods; and the sixth section forfeited the ship, if such goods were put on board with intent to import the same, and with the knowledge of the owner or master of the ship. The goods, therefore, might be condemned without the ship; but condemnation of the ship necessarily produced condemnation of the goods.
A reasonable construction on the face of the agreement would apply its terms to both ship and cargo, according to the obvious meaning of the parties; and if we resort to their letters and cotemporaneous acts, we are not left in any doubt that such was their meaning. I have remarked, that at the date of this agreement nothing had occurred *Page 229 
to call for a distinction between the ship and cargo; it was regarded and spoken of, as it was in fact, a single seizure: as property seized; as a case in which condemnation was to be sought. In the contract of the 22d of April, it is spoken of as "the case relative to the Good Friends," and the same form of expression was continued long afterwards, when there was no controversy about the ship, and when the claim was entirely upon the cargo. Thus Col. McLane, in his letter to Richard H. Bayard, under date of June 13, 1816, writes, "I send you therecords, c., in the case of the Good Friends." The receipt also for $500, given by Bayard to McLane, on the 7th of December, 1812, to the terms of which, as he accepted them, Col. McLane must be taken to have assented, proves that the contract was in reference to both ship and cargo, because it admits that the service was rendered in both cases. The fee is stated to have been paid "for services as counsel in the case of the libels at the suit of the U. States against the ship Good Friends and cargo." On this point also, the letters of Col. McLane to Mr. Bayard, of the 13th of January and 9th of February, 1813, already noticed, are important as showing the understanding and exposition of the parties. If Mr. Bayard was not concerned as counsel or interested in the cargo of the Good Friends, why should Mr. McLane communicate to him his success in collecting the duty bonds, which had no reference to the ship? Or why, if Mr. Bayard had no interest in the goods, should he mention the fact that the "Tiber" was "full of British merchandise," in offering to retain him in that case also, to be "recompensed and interested as in the Amelia cases?" Pushing the argument still further, on the supposition that the contract did not extend to the cargo of the Good Friends, we are led to the uureasonable conclusion that Mr. Bayard would have contented himself with acontingent fee of one-sixth of $5,000; which was the valuation of the ship, when the collector might have been entitled to one-half of $313,000, the valuation of ship and cargo; and that too under an agreement which stipulated that "the whole amount recovered should be divided in three equal parts," two of which should belong to the counsel, and one to the collector. Still further on this point. If the contract of the 21st and 22d of April did not include the cargo of the Good Friends, that cargo comes within the memorandum agreement of the 8th of May, 1813, extending the original contract to all the Amelia Island cases. But Mr. Bayard argued the case of the cargo of the Good Friends, as appears by the receipt before mentioned, *Page 230 
and by his notes of that argument; and he did this after a retainer by Col. McLane personally, as well as in behalf of the government. This service, therefore, rendered at the request of the collector, not falling under the original contract, but being covered by the subsequent agreement of the 8th of May, would form a good consideration for that agreement, as an executed consideration, and establish the claim for compensation from all the cases. The argument goes too far, If Mr. Bayard argued the case of the cargo of the Good Friends under any retainer from Allen McLane individually, such an argument would fall either under the contract of April or that of May, and entitle him to compensation accordingly. But the respondent contends, and we think correctly, that this latter contract was entirely prospective in its nature and executory, and therefore without any consideration to support it.
Regarding this, therefore, as a contract embracing the ship Good Friends and her cargo, we proceed to inquire what it bound Mr. Bayard to do; and whether he has performed its stipulations so as to entitle him to the compensation agreed upon.
By the terms of the contract Mr. Bayard agreed "to render his services as counsel in the courts of the U. States, for the purpose of obtaining condemnation of the property seized." Applying to these words the same rule by which we have included the cargo of the Good Friends, according to the plain intention of the parties, it is impossible for us to believe that they designed at the time any limitation of the counsel's services short of final condemnation, producing the results of forfeiture, which was the source of compensation. The means most prominent in view of the contracting parties to the attainment of this end, and which might have constituted the end, was condemnation; but if this should not be the end, as it was not, the work would be but partially done, although condemnation were in the first instance procured, and the very object for which Col. McLane resorted to Mr. Bayard, and which produced this agreement would not be accomplished. No one could foresee at that time the course which this proceeding would eventually take; itcould take no course in which the client would not stand in need of his counsel's services. Immense interests were at stake. Several suits at law immediately sprung up; these were followed by other suits in the courts, and quasi suits at the treasury, all touching the subject of this contract and designed to defeat its object, the establishment of the forfeiture, and the results thence accruing. Condemnation was only *Page 231 
desirable to Col. McLane as procuring for him the fruits of forfeiture to which both he and his counsel looked as the source of compensation: it was the end and not the means that both must be supposed to have regarded in forming the contract. Whatever form the litigation might assume; into whatever courts it might go, so that its object was condemnation, the counsel's services were just as necessary in reference to the object of the contract, as they were in the first stages of the controversy, and before condemnation in the District Court.
If this rule of construction be fatal to the complainants' case, a contrary one would be equally so: first, because a literal construction of the contract, which would hold the performance of the service up to condemnation in the District Court as satisfying thewords of the contract, would equally exclude the cargo of the Good Friends from the contract, and reduce the complainants' claim to a share of the proceeds of the ship, from which nothing was finally recovered; and second, upon no other construction than that which makes the service co-extensive with the suits inall the courts and productive of final condemnation, could this contract stand a moment in a court of equity, which on the principles before stated, watches agreements between attorney and client with a jealous eye, and requires that the services stipulated shall bear a reasonable relation to the compensation proposed. If we were compelled by any rule of construction to say that while the services under this agreement could be performed by one argument, in one case, in one court, producing condemnation, which though appealed from, entitled the counsel to leave his client to struggle unaided through two appellate courts, in search of final condemnation
and recovery, and then to come in and share with him the fruits of this recovery in the proportion of one-third to each counsel and one-third to the client, the unreasonableness of such a contract would startle a court of equity. So far from decreeing a specific execution of such a contract, the court would set it aside as unreasonable and presenting on its face the evidence of undue influence or oppression. The other construction relieves it from this imputation. It places this agreement on a footing not unworthy of the distinguished counsel who entered into it; for, so understood, it was neither oppressive nor unreasonable, considering the subject of the contract and the nature and source of compensation. The property in dispute was very valuable. The interests arising under this contract might have been immense; but in proportion as *Page 232 
these were increased, the difficulties were increased of rendering them available, and these difficulties were chiefly in. the way of the counsel. They were difficulties created by the skill and talents of his legal opponents, and which it was his duty to overcome. The interests were also from the beginning subject to the power of remission from the government, which had authority entirely to deprive both the collector and his counsel of their anticipated gains, and which did in fact very much reudce them. Whatever the contract promised, Mr. Bayard was covered by a double contingency: the uncertainty of success in the courts, and the continuing hazard of remission from government. Neither was any portion of it ever to come out of the pocket of the collector. Splendid as the prize was, it was not his until it had been won by the services of his counsel. His title to it, if earned at all by him, was earned by the mere act of seizing the ship, and the responsibility of libelling her and her cargo, a responsibility that could not be burdensome, if there was even probable cause for the seizure; (Gclston vs. Hoyt, 3 Wheat. 246;) but this title was nothing unless established in the courts by the exercise of professional ability, and the perfermance of services which, on the ground of merit, would place the successful counsel at least on an equal footing with the collector in his claim upon the avails of such a controversy. Standing thus, with one single act done by the collector, with every thing else to be done by the counsel, was there any thing unreasonable in his contracting to divide these avails with his counsel? He could not but anticipate the most strenuous opposition from the claimant of the property. It was too large in amount to be easily surrendered, and Stephen Girard was known to be a man who had both the means and the inclination to resist while resistance held out any hopes of success. The collector, therefore, strengthened himself for the contest by retaining one of the most eminent counsel at the Delaware bar; engaging his services, not by giving any thing which he had, but by promising to him a portion of that which, by the efficient exercise of those services, he hoped to acquire. He associated with him his own son, then a very young lawyer, and agreed to divide what should be recovered equally amongst the three. Was such a contract unreasonable or hard? If Col. McLane engaged to give up that which might be of great value, he gave up what was also entirely contingent and doubtful to secure the balance.
Returning to a consideration of the contract, the construction we have placed upon it in reference to the stipulated service is not only *Page 233 
required by the circumstances around it, the situation and objects of the parties, and essential to support its reasonableness; but, in our opinion, the language of the contract itself requires the same construction. Mr. Bayard bound himself to render his services in thecourts of the United States, for the purpose of obtaining condemnation of the property seized; and, in consideration thereof, was to receive a third part of what might be finally recovered. Now it was manifestly the intention of the parties, on these words of the contract, that Mr. Bayard should pursue this prosecutionthroughout the courts, and. not stop short of final condemnation and recovery. For condemnation, and final condemnation, were, in reference the objects of this contract, the same. Condemnation in the District Court submitted to, would be final condemnation, and recovery would be the consequence; but if appealed from, there is no longer any condemnation, and the obligation to render service to this end would be just as operative after sentence in the District Court as before. The judgment of an inferior court appealed from becomes wholly inoperative; (5 Mass. Rep. 376:) in admirality causes theappeal suspends the decree of the District Court altogcther
as if it had not been pronounced; (5 Cranch 231:) the trial in the appellate court on the question of condemnation is so entirely a new trial, that though the decree of the District Court may have been correct when made, if the law be changed, pending the appeal, so as to produce a change in the rule of decision, the judgment of the appellate court must reverse that decree. (1 Cranch 110.) Admitting this law, the complainants' counsel argue that it is only a new case in the appellate court as the parties choose to consider it; that the decree below, though appealed from, is final if acquiesced in; and 1 Cranch 109, and 6 Peters 427, were referred to as confirming this position. But did the parties here acquiesce in the decree of the District Court? We understand by acquiescence, as applied to this case, the acceptance of the remission and compliance with its conditions. That was the fact when the court in 6 Peters, referred to the Circuit Court's decree. It was an acquiescence by both parties. Stephen Girard had paid, and the U. States had received, the double duties reserved under the remission; and neither party could afterwards controvert the Circuit Court's decree, which was made subject to the remission. It was in fact a decree performed. But what was Mr. Girard's acquiescence in the District Court's decree? The facts relied on are, that he filed the certificate of remission in the District Court, and paid the costs *Page 234 
in March, 1814. Is this conclusive evidence of acquiescence? Then what shall we say to the fact, that additional causes of appeal were filed by Girard after this, to wit: on the 24th of October, 1815? So far from acquiescing in the District Court's decree, Mr. Girard actually resisted the Circuit Court's decree, made in September, 1818, by appealing from that decree to the Supreme Court. Adding to this, that up to the date of that decree he had never complied with, any of the terms of remission, except the payment of costs; that he never presented his remission to the Circuit Court, and that every step he took in that court was one of resistance and not ofsubmission, we cannot find any sufficient ground to say that Mr. Girard acquiesced in the decree of the District Court. The position of the case, therefore, in the Circuit Court, left the contract of Mr. Bayard,. at the time he went to Europe,unperformed: no condemnation produced; no recovery had. The sentence against the ship and cargo being appealed from, no longer existed; it was wholly inoperative; suspendedaltogether; and when Mr. Bayard sailed in May, 1813, the causes stood as it were de novo in the Circuit Court, where condemnation was not obtained until 1818; a condemnation conditional in its character, and that appealed from.
There was neither condemnation, nor recovery. It is true that Mr. Bayard did not undertake to insure either; but he did undertake to render his services in the courts of the II. States; inall the courts; for the purpose of procuring the one: and he agreed to be compensated out of the other. If recovery was had without condemnation, and by means of his services, the contract secured him his share; but recovery under condemnation, final condemnation, would not entitle him to compensation, unless he fully rendered service for procuring that condemnation. Recovery was the end, condemnation the means; and we cannot bring ourselves to the conclusion that it ever was the intention of these parties, that the attorney should stop short of that end; withdraw his services after condemnation obtained in the District Court, though appealed from; leave the client unaided, or by the aid of other counsel, to work out recovery through final condemnation; and then to share the proceeds of recovery, as upon a full performance of his contract.
These suits commenced in the courts on the 5th of May, 1812. Mr. Bayard argued the case of the Good Friends in November and December of that year, and decrees of condemnation were pronounced in March and April 1813, which decrees were immediately appealed *Page 235 
from, and the cause taken to the Circuit Court. Mr. Bayard left the country in May, never to have any further connection with the case. He never appeared as counsel in the case after it reached the Circuit Court; his name is not on the record, and the causes of appeal were not filed until after his departure. The case stood there with but little movement on either side for more than five years; and notwithstanding the claimant of the property had obtained a conditional remission at the treasury, founded on the forfeiture, in February, 1814, he kept up a resistance to the condemnation until September, 1818, and was not compelled by any movement on the part of Col. McLane's counsel, to comply with the terms of remission or abide by the forfeiture; a movement proper to be made, and which finally was made, in the cause. Instead of deferring payment of the additional duties now claimed as a part of the fund recovered under this contract until February, 1819, Col. McLane might, by active movements on the part of his counsel, have been placed in possession of this fund as early as 1814, and the contest thus closed. But it was said in the argument that Col. McLane, instead of moving to enforce compliance with the remission, was moving against it; protesting against the power of the government to remit his share of the forfeiture; a fruitless contest as it turned out, and one in which it is said Mr. Bayard's contract did not oblige him to engage. But was he not entitled to Bayard's counsel to restrain him from this fruitless pursuit, and conduct him in the course that would either put an end to the cause by establishing condemnation and enforcing forfeiture; or equally end that cause by enforcing the terms of remission, and perfecting recovery through that means? We say nothing of the applications to the district judge for statements on which to found the remissions; of motions for surrendering delivery bonds; of the controversy with the U. States for the collector's share of single duties, paid so early as 1813, to the one-half of which he established his title under the seizure; nor of the defeazable decrees in the Circuit Court recognizing the remission without enforcing its conditions for the benefit of the collector; yet it is apparent from the nature of the case, its progress and results, that even if there were no regular argument in the Circuit Court, the collector, in matters strictly within the cause, often stood in need of the advice and counsel of Mr. Bayard, when he by absence and death was unable to render that service. This appears also from the fact that Col. McLanedid employ other counsel; which was the more necessary, because one of the counsel *Page 236 
originally with him had, by a change of position with his son, placed himself on the other side, and become either neutral or actively against him. The call made by Mr. McLane in this exeremity on Mr. R. H. Bayard for help and counsel in concerting measures for recovery, and which is so much relied on as recognizing an interest in Mr. Bayard's family in the result of this suit, proves also that he had occasion for the services in the cause which Mr. Bayard might have rendered, and of which he was willing to accept even asubstituted performance that was never afforded. Viewing this letter as a lawyer; supposing McLane to have known that Bayard's family could have no interest in this suit for a part performance of service under his contract, (a point, by the way, disputed in this cause,) the admission of an interest would be an admission of the performance; but we are not called upon to construe this letter in its legal effect, but to weigh its force as evidence of the admission of a fact, which fact is by the very object of the letter denied. Viewing it in this light, it is impossible for us to construe a letter calling on Mr. R. H. Bayard to concert measures for a recovery, in a case then standing without condemnation, into an admission of the full performance of service by J. A. Bayard, up to condemnation.
The plain meaning of the letter is this: you are interested in the case of the Good Friends under my contract with your father to procure condemnation; he has rendered in his lifetime important servicetowards that object, but it is not yet attained; let us meet and consult about the case, and "should you be of opinion we haveany chance to recover," you may substitute your father's services, and we will still go on under the old contract. He seems to have considered the case at that time as next to desperate, as to any advantage he was likely to gain from it, and Mr. Richard H. Bayard seems to have been of the same opinion, as he did not even answer the letter. At that time it appeared to be the impression that the collector had no interest in the remission fund. His only hope seemed to be in resistance of the power of remission, and Mr. Rodney, (who had been retained in Mr. Bayard's absence,) seems to have joined in this error; for we find him as counsel for the collector,protesting against the remission. The remissions under the act of July, 1813, were granted on complying with the provisions of the act of January, 1813, that is, on payment of the same duties which would have been payable on the cargo if legally imported after the 1st of July, 1812, namely, upon payment of the double duties imposed by the act of July, 1812; and this term duties seems to *Page 237 
have misled them all: for we find Col. McLane paying over to the United States all of the single duties, without making any claim to them; nor does he appear at this time to have been aware of his interest in the additional duties; for though that is now spoken of as a conceded interest, the case agreed between him and the U. States shows that it was awarded to him by a formal decision
of the secretary of the treasury, and this could not have been earlier than 1819. So strangely does time change the appearance of things, and especially the construction of men's actions. We present this as a probable explanation of this strange state of facts, that in 1816, a fund of fifty thousand dollars should have passed through the collector's hands without his making any claim to it, though he was entitled to one-half of it; that there was another fund of equal amount in which he was equally interested, any day attainable by a motion in the Circuit Court in the case of the Good Friends, to compel compliance with the terms of remission; that though all his interest in these funds arose under the remission, the collector was at the same time protesting against the remission; writing to Mr. R. H. Bayard to concert measures for recovery, if he thought there was "any chance" of recovery; offering to recognize an interest in Mr. Bayard's family to the extent of one-third of his interest; and this letter absolutely remaining unanswered. It is highly probable that in 1816, no one supposed the collector had any interest in, this remission fund: all seem to have thought that the government had remitted the whole forfeiture, and was itself entitled to all the double duties reserved. Who can say if Mr. Bayard had gone to the consultation thus invited by the collector, with the learning and experience of his father; or had investigated the case with the ability which has since distinguished himself; who can say that he might not have discovered this legal error; that he might not have said to Col. McLane, "Sir, you have not only a chance but a certainty of recovery; all you have been wanting since February, 1814, is counsel; correct advice; counsel that my father would have given you long ago, had he been here; come with me into the Circuit Court, and we will move in your long neglected case of the Good Friends, which stands there yet undecided; you shall withdraw yourprotest, and I will ask the court either to enforce against Mr. Girard the terms of remission, or to affirm the decree of the District Court and establish the forfeiture. By the first motion you will realize, now, one-half the additional duties, and, hereafter, one-half of the single duties, if Girard submit; if he *Page 238 
continue to resist, you will perfect your title through condemnation, to one-half of the whole forfeiture. This counsel is a part of the service my father agreed to render in the case of the Good Friends, and I, as his substitute, will now carry out that service." Such a result of that interview is not only possible but probable. At this time of day we can hardly account for the apparent blindness that seems to have overspread them all in considering this reservationout of forfeiture, as the proceeds of legal duties andnot a part of the forfeiture. It is not for us to say that J. A. Bayard's legal discernment would certainly have detected this error; it is enough to say that under the contract of April, 1812, Col. McLane was entitled to his counsel in this position of his case, and to his services in carrying out the measures to which a proper understanding of these matters necessarily led in thecause. How much Col. McLane, at this period, stood in need of that counsel cannot but be apparent to all.
The case of the Good Friends slumbered on in the Circuit Court, with occasional starts, until the 29th of September, 1818. Almost at the moment of its entering that court Mr. Bayard had put it out of his power by going abroad, and his subsequent death had forever disabled him from rendering any other service in the case. Mr. Girard had obtained a conditional remission of the forfeiture; complied with it in part by paying costs, but refusing to comply with the substantial condition on which it was granted; the collector standing out in ill-advised opposition to the power of remission with no aid from Mr. Bayard's counsel to place him in the true path of submitting to the remission and enforcing its terms; summoning to his aid other counsel, in and out of the State, and invoking of Mr. R. H. Bayard even a substitution of his father's services; when, on the 29th of September, 1818, an important step was taken in his cause, and the Circuit Court "after hearing advocates and counsel on both sides" affirmed the decree of the District Court condemning the ship Good Friends and cargo, subject to the remission of the secretary of the treasury. How are we to understand this? If it be true that the judgment of the Circuit Court was rendering after hearing advocates and counsel on both sides, as the record states, it puts an end to the important controversy, whether Mr. Bayard rendered a full performance of service under his contract. The bill states that these cases were not contested in the Circuit Court, but that the decrees were "formal entries made by arrangement of counsel," leaving to the claimant the right of contesting the cases in the Supreme Court. The *Page 239 
answer denies that this decree was merely formal, made by arrangement of counsel and without contest, though the defendant "believes the cases were not argued on the question of reversal or affirmance at the bar of the Circuit Court." On the one side it is said that the record entry is conclusive as to this fact, and that the answer being but the answer of an executor, and making as it does express reference to the record as to matters proveable by record, does not contradict it; on the other side it is urged, that this is the answer not merely of an executor, but of one of the counsel in the cause, who had a personal interest in, and knowledge of, the fact about which he speaks, and that therefore, what he believes the court will believe. But it is replied that it does not appear that Mr. Louis McLane acted as counsel, or claimed any interest under the contract of 22d of April; he was not a party to it originally, and the record does not show that he was of counsel with his father in the Circuit Court, or present at the date of this decree. On examining the answer, we do not find any admission that he acted under the original agreement, unless it be the statement on page 15, that the labor of preparing the causes in the District Court for trial "devolved on the district attorney and thejunior counsel retained in the cases by the collector." His argument of the cause may then be referred to his engagement with the collector officially, as we know that there was such an engagement. Standing thus, without any proof, we should perhaps be bound to say, in accordance with the record, that the decree of the Circuit Court was made after hearing counsel on both sides. But the argument on this point seems to imply, that Mr. Bayard was not bound to render any service in the Circuit Court except by argument there on the question of affirmance or reversal; an assumption which we have already shown is not warranted by the true construction of the contract.
(4. QUANTUM MERUIT.) We come then to consider, finally, the complainants' right to recover compensation for the services of Mr. Bayard as for a part performance of his contract, on the principle of apportionment and quantum meruit. The chancellor has shown from the authorities cited by him, to which we refer, that the principle is the same in equity as at law, that where it is a clear case ofcondition precedent, performance must be shown. At law, though the cases on this subject have run into great refinement in applying the principle, yet the principle itself is conceded in all the cases, that no action of indebitatus assumpsit, or upon a quantum meruit, can be *Page 240 
brought for any tiling done under a special agreement which remains open; but that where the terms of a special agreement have beenperformed on the one side, and nothing is to be done on the other but a money payment, such payment may be enforced by an action of indebitatus assumpsit. And to ascertain what is a condition precedent this rule has been stated, that "when the mutual promises or covenants go to the whole consideration on both sides,, they are mutual conditions, and performance must be averred. (Cutter vs. Powell, n., Smith's cases 8;Pordage vs. Cole, 2 Sound. Rep. 320, n. 4.) Sergeant Williams in his learned note to this case complains that many of the cases have been decided upon nice and technical distinctions; yet he states that the rule contained in them all is clear and indisputable, that where the covenants are dependent the plaintiff must aver performance, and cannot recover out of the contract.
It is hardly necessary to say that the entire performance of service by Mr. Bayard is in this case a condition precedent, and the agreement to pay a dependent covenant. The contract stipulates that inconsideration of his rendering that service, he shall be entitled to the compensation. Not only by the words and intention of the parties, but by the nature of the service and the source of compensation, it is made absolutely necessary that performance shallprecede compensation. The services personal; professional; indivisible; incapable of apportionment: the fund contingent, and the right to it necessarily postponed until after performance; because the fund exists only through, and by, and as the result of performance.
I have thus endeavored, imperfectly I fear, to present some of the reasons upon which the judgment of the court is founded. They are perfectly satisfactory to our minds, though it would be presumptuous to say that there is no doubt about the correctness of the result to which we have arrived. Some of the brightest intellects in this whole country, in and out of this cause, have been brought to bear upon these questions we are now deciding, and their opinions stand in confident array against each' other. But we have this to say. No one has ever come up to the consideration of these questions with the same amount of extrinsic aid that we have; none but ourselves and our lamented colleague, have ever listened to the powerful and thorough investigations that these questions have twice received at this bar; and none but ourselves and his honor the chancellor, have ever come todecide them with perfect impartiality. We have investigated *Page 241 
the case with patient and painful anxiety; and we come unanimously up to the conclusion that James A. Bayard, at the time of his death, had not performed this contract, and his representatives are not entitled to recover the compensation sought.
Our judgment is, that the decree of the chancellor he affirmed.
 Decree affirmed.